446 So.2d 280 (1984)
STATE of Louisiana
v.
Frederick A. OSSEY.
No. 83-KK-1318.
Supreme Court of Louisiana.
January 16, 1984.
Rehearing Denied February 9, 1984.
*282 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John Mamoulides, Dist. Atty., William C. Credo, III, William Hall, Asst. Dist. Attys., for plaintiff-respondent.
Richard Thompson, New Orleans, Joseph J. Tosh, Gretna, for defendant-relator.
MARCUS, Justice.
Frederick A. Ossey was charged by bill of information with possession with intent to distribute Pentazocine (Talwin) in violation of La.R.S. 40:967(A). Prior to trial, defendant filed a motion to suppress physical evidence. After a hearing, the trial judge denied the motion to suppress. The court of appeal denied defendant's application for writs. Upon defendant's application to this court, we granted a writ and ordered the case remanded to the court of appeal for briefing, argument and opinion in light of Florida v. Royer, ___ U.S. ___, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), and United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[1] On remand, the court of appeal again denied defendant's application for writs, finding that the trial judge correctly denied the motion to suppress.[2] Upon defendant's application, we granted certiorari to review the correctness of that ruling.[3]
Defendant contends the trial judge erred in denying his motion to suppress drugs seized pursuant to a warrantless search of his luggage at New Orleans International Airport. He argues that he was being detained illegally and that he did not consent to the search; therefore, the evidence obtained as a result of this illegal search is inadmissible.
Evidence adduced at the suppression hearing reveals that defendant arrived at New Orleans International Airport on January 17, 1983 aboard Delta Airlines Flight # 1164 from Los Angeles, California. Upon deplaning, he aroused the attention of Agents Whitehead and Hurley of the Jefferson Parish Sheriff's Office. These officers were plain clothes narcotics agents who had been assigned to the airport for the past five years and two years, respectively. Their main function was to detect and apprehend drug couriers primarily by the use of a set of characteristics normally displayed by these persons, called the "drug courier profile." According to *283 Agents Whitehead and Hurley, they became suspicious of defendant soon after he deplaned because his actions were consistent with two elements of the drug courier profile: he arrived from Los Angeles, a source city for the transportation of drugs into New Orleans; and, defendant slowly walked down the concourse, occasionally stopping to look over his shoulder. Agent Hurley described defendant's actions as follows: "when he got off the aircraft he appeared to act in what I would consider a nervous manner. He was looking around, he was hesitant ... to walk down the concourse towards the baggage area.... [He was l]ooking around, checking to see if someone was looking for him or he was being observed by anybody." The agents then placed defendant under surveillance and followed him down the concourse. Agent Whitehead testified that defendant stopped several times to look over his shoulder and that, upon reaching the escalator, he looked around again before proceeding downstairs to the baggage claim area.
Defendant retrieved one small blue leather bag from the baggage claim conveyer belt. Agent Whitehead testified that a relatively small amount of luggage for a long distance trip is another characteristic of the drug courier profile. Therefore, according to Agent Whitehead, once he saw the size of the bag claimed by defendant, "it just strengthened my convictions that he was possibly transporting narcotics."
While Agent Whitehead was observing defendant inside the baggage claim area, Agent Hurley waited just outside of the exit doors. As defendant left the building carrying the small blue bag, Agent Hurley approached him, displayed his police identification and asked defendant if he would speak to him. According to Agent Hurley, defendant responded by saying, "Sure." He was asked for identification and a plane ticket. Defendant produced a current California driver's license in the name of Frederick A. Ossey and a Delta Airlines ticket in the name of James Gibbens. Agent Whitehead arrived, displayed his police identification, and looked at the license and ticket. He noticed the different names and that the ticket was a one-way ticket purchased with cash. Agent Whitehead testified that traveling under an alias and purchasing a one-way ticket with cash are two more characteristics of the drug courier profile.
Defendant was asked by Agent Whitehead about the different names. After hesitating defendant responded that Gibbens was a cousin who had purchased the ticket for him. Agent Whitehead then advised defendant that they were conducting a narcotics investigation and that they believed that he was transporting narcotics. After informing defendant that he could refuse the request, Agent Whitehead asked him if he would allow them to search his luggage. Defendant responded by asking to see a search warrant. According to Agent Whitehead, he informed defendant that they did not have a search warrant, but if he would accompany them to their airport office, then he would prepare one. They proceeded upstairs to the agents' third floor office with Agent Hurley carrying defendant's bag.
Upon arriving at the office, Agent Hurley began to type out a request for a search warrant when defendant said that "he didn't have any drugs in the bag. You can go ahead and look." Agent Whitehead prepared a written consent form, read it to defendant and then gave it to him to sign. According to Agent Whitehead, defendant appeared to sign the form. It was not until after the search that the agents discovered that defendant did not in fact sign the consent form. Noticing that defendant's bag was locked, Agent Hurley located the key to the bag among the items that he had previously removed from defendant's pockets. According to Agent Hurley, the agents checked defendant's pockets for their own protection because they were concerned that he might have a weapon. The agents opened the bag, discovered 6500 sets of T's and Blues, and placed defendant under arrest.
*284 Defendant's narrative is different in several respects from the events as described by the agents. He testified that he did not hesitantly or nervously walk down the concourse and that as he tried to leave the airport, two officers stopped him. After refusing to allow the officers to search his bag without a search warrant, they told him that they could get a warrant and then said, "Let's go." Once upstairs in the agents' office, Agent Hurley filled out a search warrant and Agent Whitehead prepared a consent to search form. Defendant refused to sign the consent form and denied that he pretended to do so. According to defendant, after he refused to consent to the search, Agent Hurley became exasperated and opened the bag anyway.
The trial judge accepted the testimony of the agents, finding that defendant's statements were "self-serving." According to the judge, the initial encounter was a permissible Terry-type investigatory stop. Further, the judge found that defendant was not "placed under arrest or otherwise detained" when asked to accompany the agents to their office; he went along "voluntarily, that is he appeared to cooperate in order to convince the officers of his innocence." Finally, the judge found that the consent to search was given "freely and voluntarily." Therefore, since defendant was not illegally detained when he consented to the search, the motion to suppress was denied.
The validity of an airport search on facts very similar to those in the instant case has been addressed recently by the U.S. Supreme Court in Florida v. Royer, supra, and United States v. Mendenhall, supra. In Mendenhall, two DEA agents observed Mendenhall at Detroit Metropolitan Airport. After observing Mendenhall's conduct, the agents determined that her behavior fit the drug courier profile in several respects: (1) Mendenhall arrived on a flight from Los Angeles, a source city for the transportation of drugs into Detroit; (2) she was the last person to leave the plane, appeared very nervous, and scanned the area; (3) she proceeded past the baggage area without claiming any luggage; and (4) she changed airlines for her flight out of Detroit. The agents approached Mendenhall, identified themselves as federal agents, and asked to see her identification and airline ticket. This revealed that Mendenhall was traveling under an alias. She became visibly more nervous when the agents identified themselves as federal narcotics agents.
After returning the ticket and driver's license, the agents asked her if she would accompany them to the airport DEA office for further questioning. She did so, although the record does not indicate a verbal response to the request. At the office the agents asked her if she would consent to a search. She responded, "Go ahead." A small package of heroin was found in the search.
The opinion initially focused on whether a seizure had occurred. It stated that a person is "`seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The Court concluded that no seizure in fact occurred. Next, agreeing with the findings of fact of the trial judge, the Court found that Mendenhall accompanied the agents to the office voluntarily in a spirit of apparent cooperation and that she freely and voluntarily consented to the search. Since Mendenhall was not being illegally detained when she consented to the search, the resulting seizure of the drugs was permissible.
In Royer, unlike Mendenhall, the Court held that the drugs should have been suppressed. Because Royer's appearance, mannerisms, luggage and actions fit the drug courier profile, he was placed under surveillance by two Dade County plain clothes detectives. After he had purchased a one way ticket to New York and checked his two suitcases, the two detectives approached him, identified themselves as policemen, and asked if Royer had a moment to speak with them; he said "Yes." Upon request, Royer produced a driver's license *285 in the name of Royer and an airline ticket in the name of Holt. Royer explained that a friend had made the reservations for him. The detectives informed him that they were conducting a narcotics investigation and suspected him of transporting drugs. Royer was now visibly nervous.
While still retaining Royer's ticket and license, the detectives asked him to accompany them to a room off of the concourse. Royer said nothing in response but went with them as he had been asked to do. Without Royer's consent, one of the detectives retrieved Royer's luggage, which bore the name Holt, from the airline and brought it to the room. When asked if he would consent to a search of his luggage, Royer produced a key and unlocked one of the suitcases. Marijuana was found in both bags and Royer was then placed under arrest.
The Court determined that the initial encounter in which the detectives asked for and examined Royer's license and ticket was a permissible consensual encounter. But Royer was "seized" for fourth amendment purposes when the officers told him that he was suspected of transporting drugs, retained his ticket and license and asked him to accompany them to another room. Adopting the objective standard from Mendenhall, these circumstances amounted to a "show of official authority such that `a reasonable person would have believed he was not free to leave.'" Next, the Court found that even though a seizure occurred, there existed reasonable, articulable suspicion to justify a Terry-type temporary detention. The circumstances that led to this finding were that (1) Royer was traveling under an alias; (2) he paid cash for a one-way ticket; (3) the two bags checked to New York bore a fictitious name and no address; and (4) Royer's "appearance and conduct in general." Finally, the Court held that the limits of a permissible temporary detention had been exceeded at the time Royer consented to the search. According to the Court, "what had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room.... As a practical matter, Royer was under arrest."
In the instant case, the two crucial issues are whether defendant was being illegally detained at the time of his consent to the search and whether he freely and voluntarily consented to the search. The initial encounter between defendant and Agent Hurley just outside of the baggage claim area exit doors was not a "seizure" for fourth amendment purposes. The purpose of the fourth amendment is not to eliminate all contact between the police and the citizenry. As long as a reasonable person would feel free to disregard the encounter and walk away, there has been no "seizure." Florida v. Royer, supra; State v. Belton, 441 So.2d 1195 (La.1983). Defendant was approached in a public area by a person dressed in plain clothes who asked defendant if the agent could speak to him; his response was, "Sure." The mere fact that the agent displayed his police identification did not convert this otherwise consensual affair into a "seizure."
Defendant did not become "seized" within the meaning of the fourth amendment until Agent Whitehead informed defendant that they were conducting a narcotics investigation and that they believed he was transporting drugs. By this time, defendant had been confronted by two agents, both of whom identified themselves as narcotics agents; he had been dispossessed of his driver's license and plane ticket; he had been questioned about the name discrepancy; and, most importantly, he was told that he was the focus of an investigation. Taken together, these circumstances "amount to a show of official authority such that a `reasonable person would have believed he was not free to leave.'" Florida v. Royer, supra (quoting United States v. Mendenhall, supra).
However, the right of law enforcement officers to stop and interrogate one reasonably suspected of criminal conduct is recognized by La.Code Crim.P. art. 215.1, as well as by both state and federal *286 jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, supra. We have held that reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct. State v. Belton, supra.
When the "seizure" occurred, there existed sufficient articulable facts to justify a Terry-type stop based on a reasonable belief that defendant was transporting drugs. The agents knew that defendant arrived from a source city for the transportation of drugs into New Orleans; he was visibly nervous, occasionally stopping to look over his shoulder; he claimed a relatively small piece of luggage compared to the length of his flight; he was traveling under an alias; and, he purchased a one-way ticket with cash. Since these were adequate grounds for a reasonable belief that defendant was carrying drugs, the "seizure" was a permissible Terry-type investigatory detention.
The agents' conduct during this "seizure" did not exceed the scope of a lawful Terry stop. First, Agent Whitehead requested defendant's consent to a warrantless search of his bag; defendant refused. Next, Agent Whitehead asked him to accompany them to their office; defendant agreed. The trial judge found that defendant voluntarily accompanied the agents in a spirit of apparent cooperation. Since defendant was not being illegally detained at this time, whether consent to accompany the agents was in fact voluntary is to be determined by a review of the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances of each case. The factual determinations of the trial judge are entitled to great weight on appellate review. State v. Edwards, 434 So.2d 395 (La.1983); State v. Bourgeois, 388 So.2d 359 (La.1980). Upon a review of the surrounding circumstances,[4] we cannot say that the trial judge's finding of voluntariness was in error. The request to accompany the agents was made in a public place by agents dressed in plain clothes. There was no threat, show of force, or physical touching. The agent's statement to defendant was phrased in the form of a request instead of a demand. Finally, the request was not so overbearingly coercive to defendant as to render his consent involuntarily; he had already refused to allow a search of his bag, thereby demonstrating his knowledge of and ability to exercise his right to decline the agent's requests. Therefore, since defendant voluntarily accompanied the agents,[5] he was *287 not being illegally detained when he consented to the search in the agents' office.
The sole remaining issue is whether defendant freely and voluntarily consented to the search. One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was given freely and voluntarily. Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case. The factual determinations of the trial judge are entitled to great weight on appellate review. State v. Edwards, supra; State v. Smith, 433 So.2d 688 (La. 1983); State v. Bourgeois, supra. The trial judge found that defendant freely and voluntarily consented to the search. Defendant told the agents to open his bag. This statement was made by defendant on his own initiative and without provocation. We find the trial judge did not err in finding this oral consent[6] was given freely and voluntarily. Therefore, the consent search was permissible.[7] Hence, the trial judge correctly denied the motion to suppress the drugs seized pursuant to the search of defendant's bag.

DECREE
For the reasons assigned, the ruling of the trial judge denying the motion to suppress is affirmed and the case is remanded to the district court for further proceedings.
CALOGERO, J., dissents.
DIXON, C.J., and DENNIS, J., dissent with reasons.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
On January 17, 1983 Ossey arrived in New Orleans on a nonstop flight from Los Angeles. After deplaning he walked slowly through the concourse, occasionally stopping to look over his shoulder. He proceeded toward the baggage claim area, pausing to look around again before going down the escalator. In the baggage claim area, he retrieved a canvas luggage piece with a shoulder strap which was approximately two and one-half by two feet deep.
As Ossey attempted to exit the terminal, two undercover narcotics agents of the Jefferson Parish Sheriff's Department, Officers Whitehead and Hurley, approached him. They had observed Ossey virtually from the time he got off the plane. In addition to the above (with which Ossey agrees), they testified that he appeared nervous (with which Ossey does not agree). According to the officers' testimony, such behavior from a passenger who arrives from a "source city" (such as Los Angeles) is consistent with a "drug courier profile" developed by the Drug Enforcement Agency. In particular, they pointed to the following factors as being those which cumulatively aroused their suspicion: where he was coming from; the nervousness *288 in looking around; and the small size of his bag after such a long flight. No confidential informant had tipped them, and the above facts are the only ones which the officers cited as justifying their decision to approach the defendant at this point.
Both Ossey and the officers agree that the officers identified themselves and asked him if he would mind answering some questions. He agreed and, in response to their request, produced his California driver's license and his airplane ticket. The ticket was in the name of James Gibbens who Ossey claimed was his cousin who had made the reservations.
Because traveling under an alias is also a characteristic set out in the profile, the officers then informed Ossey that they were conducting a narcotics investigation and that they felt Ossey was transporting narcotics. Whitehead testified that he asked Ossey for permission to search him and his bag and also informed him that he did not have to consent if he did not want to. Ossey denies that he was told the latter. Both agree, however, that Ossey's response was to ask if they had a search warrant. They told him they did not but they would get one if he would come with them to their office. Everyone also agrees that Hurley grabbed Ossey's bag and carried it to the office on the third floor of the airport. Ossey was not formally put under arrest or advised of his rights at this time.
Whitehead testified that he believed that Ossey was free to leave at any time and that he voluntarily accompanied the officers to their office. He does not indicate any facts on which to base those beliefs. Ossey, to the contrary testified that he did not feel free to leave and that he was never so informed. He also testified that the officers, in response to his asking if they had a search warrant, simply said, "No, but we can get one. Let's go." In response to a question by the court as to why he did not feel free to leave, Ossey replied, "Well you have two police officers standing in front of you and one grabbing your bag and saying let's go. How do you feel like you're free to go?"
When they arrived at the office, Ossey was searched and told to empty his pockets. Among the contents was a luggage key. This search was justified by Hurley on self-protection grounds despite the fact that Ossey had been under continual observation by the officers from the time he got off the plane (where he could not have had a weapon) and despite his not yet being under arrest. According to the officers, Hurley then began to type out a warrant application whereupon Ossey asked what they were doing. Whitehead replied that they were getting a search warrant. Ossey then said, according to the officers, to go ahead and open the bag. Whitehead then testified that he prepared a written consent form and explained its provisions to Ossey. He handed it to him to sign, and both officers testified that Ossey appeared to them to have signed it. They opened the bag with the key and found 6500 sets of "T's" and "blues." The consent form, however, was not in fact signed, and, after the drugs were found, the officers testified that Ossey refused to sign it and requested a lawyer. Whitehead admitted that failing to make sure the form was signed was an oversight on his part and explained that he was perhaps "over anxious." Whitehead is an officer with twelve years experience, the last ten as a narcotics agent; Hurley has eight years experience, six as a narcotics agent.
Ossey, on the other hand, described the events in the room somewhat differently. He claimed that after he was searched Whitehead made a call at the end of which he told Hurley that it would take two to three hours to get a warrant. Hurley then began to type, and Whitehead presented Ossey with a consent form. Ossey claimed he asked what it was, and, when told, stated again that he wanted to see a search warrant. At that point, according to Ossey, Hurley said, "Oh, fuck it," and opened the bag. Ossey denied having pretended to sign the form.
*289 Once the drugs were found, the officers finally placed Ossey under formal arrest and advised him of his Miranda rights. Ossey denied that he was informed of his Miranda rights until he appeared before the magistrate court.
The trial court viewed the case as a credibility decision. The judge took note of the self-serving nature of Ossey's testimony, and he stated that the officers had no motive to tell falsehoods. In effect, he chose their version of events. He then found the initial stop to have been based on articulable suspicion of criminal activity and therefore justified by the holding of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He also found that Ossey accompanied the officers voluntarily and that he freely and voluntarily consented to the search. Finally, he found that the officers were in good faith and that "the purpose of the exclusionary rule is not served when the officers believe in good faith that they are performing a lawful search" (that is, they believed that Ossey had signed the form).
The court of appeal stated that Florida v. Royer, supra, did not overrule United States v. Mendenhall, supra, but rather served to clarify the application of the holding in Mendenhall that "`[a]s long as the person to whom the questions are put, remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.'" State v. Ossey, 435 So.2d 1039 at 1041 (La.App.1983).
After noting the trial court's findings as to credibility, however, the appellate court went on to hold that searches and seizures related to the drug trade should not be subject to the same scrutiny as in other areas. Accordingly, it denied the writ, agreeing with the trial court's finding that Ossey's consent was freely and voluntarily given and that he was not unconstitutionally detained prior to his consent.
For the purposes of this dissent, the trial judge's findings based on the credibility of the witnesses are accepted, and the issue becomes whether the courts below erred in applying the law to the officers' version of the events.
The facts in United States v. Mendenhall, supra (a plurality opinion written by Justice Stewart, joined by Justice Rehnquist, and concurred in by the Chief Justice and Justices Powell and Blackmun), appear at first blush to be similar. Mendenhall was initially stopped by narcotics agents in Detroit after arriving from Los Angeles. She was the last to leave the plane, carried a small luggage piece, nervously scanned the area, and retrieved no luggage from the claim area. She then went to a ticket agent and got a boarding pass for a flight to Pittsburgh. The agents approached her as she walked through the concourse and identified themselves. Like Ossey, she was traveling under an alias. She became visibly more nervous during the stop.
The officers then returned her ticket and her license and asked if she would accompany them to their office for further questions. Though the record did not reveal what was said, she did accompany the officers to their office. There she was asked to consent to a search of her luggage and person. She said, "Go ahead." Two bags of heroin were found in her undergarments. The result of the plurality decision was that the evidence was admissible.
Justices Stewart and Rehnquist viewed the events as entirely consensual. Adopting a totality of the circumstances test, they concluded:
"... a person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request *290 might be compelled." United States v. Mendenhall, supra 446 U.S. at 554, 100 S.Ct. at 1877.
The subjective intentions and beliefs of the officers are irrelevant. Id. at 554 n. 6, 100 S.Ct. 1877 n. 6.
The three concurring justices, on the other hand, felt that there had been a seizure but that there was reasonable suspicion to warrant it. They felt there was no illegal detention when she consented to the search. Id. at 560, 100 S.Ct. at 1880. The four dissenting justices argued that reasonable grounds for suspecting Mendenhall did not exist; hence, her detention was illegal. Id. at 566-77, 100 S.Ct. at 1883-89. See also Florida v. Royer, supra 103 S.Ct. at 1327 n. 9.
Prior to Mendenhall, this court's jurisprudence tended to be in keeping with the views of the dissenters in Mendenhall. This court fairly consistently, if not unanimously, rejected the proposition that actions of a suspect compatible with the drug courier profile alone were a sufficiently objective basis to justify a stop under the Terry v. Ohio "articulable suspicion" rule. See State v. Washington, 364 So.2d 958 (La.1978); State v. Matthews, 366 So.2d 1348 (La.1978); State v. Brown, 370 So.2d 547 (La.1979) (evidence seized, however, was held admissible due to an informant's tip in addition to the profile); State v. Shy, 373 So.2d 145 (La.1979) (evidence, however, held admissible due to free and voluntary consent to search); State v. Key, 375 So.2d 1354 (La.1979).
Subsequent to Mendenhall, drug profile cases considered by this court have involved only stops which were based on other factors in addition to the drug profile. E.g., State v. Salazar, 389 So.2d 1295 (La.1980) (tip from police in Miami in addition to the profile); State v. Coleman, 412 So.2d 532 (La.1982) (facts showed probable cause to arrest and there was consent to the search). In State v. Watson, 416 So.2d 919 (La.1982), this court, citing Mendenhall, held that a suspect who met a known drug dealer at the airport and who otherwise met the profile was properly stopped by police. She was held to have consented to the search prior to accompanying the officers to their office. The evidence was held admissible.
Mendenhall and the relevant Louisiana cases must now, however, be read in light of Florida v. Royer, supra. In this case Royer was spotted by agents in Miami prior to checking two pieces of luggage for a flight to New York. His behavior was consistent with several characteristics of the drug courier profile. The agents approached him, identified themselves, and asked for his identification. They discovered that he was traveling under an alias. They did not return his license and ticket, and they asked him to accompany them to their office. Royer did so. One agent, without Royer's consent, retrieved his checked luggage from the airline. In the office they asked if Royer would consent to a search. Royer opened one case while the other had to be forced open because Royer did not know the combination. Marijuana was found in both. The result of the court's decision in this case was that the evidence was suppressed.
Justice White, joined by Justices Marshall, Powell and Stevens, wrote the plurality opinion in which Justice Brennan concurred in the result. Justice Blackmun dissented as did Justice Rehnquist, joined by the Chief Justice and Justice O'Connor. The plurality opinion held, after attempting to review and put into order the jurisprudence, that Royer was effectively seized for Fourth Amendment purposes when the officers retained his license and ticket and asked him to accompany the officers to their office. Florida v. Royer, supra, 103 S.Ct. at 1326 (citing United States v. Mendenhall, supra 446 U.S. at 554, 100 S.Ct. at 1877). It also held that the facts observed by the officers, including the use of the alias, justified their temporary detention of him and his luggage "while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." Id. The opinion also recognized that a voluntary consent at this point would have been possible; however, *291 by the time the search actually took place, the "detention to which he was subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." Id. As characterized by the Court: what "had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." Id. 103 S.Ct. at 1327. In finding an unnecessary intrusion, the Court emphasized the officers' retention of the ticket and license, their failure to inform Royer that he was free to go, and their moving him from a public place to an interrogation room. Id. at 1328-29. The plurality recognized, finally, that there is no "... litmus paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigatory stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances..." Id. at 1329.
The case before this court is obviously one of the endless variations, one which lies somewhere between Mendenhall and Royer. In light of these cases, the crucial factors in such a case today appear to be whether an unreasonable seizure takes place after the suspect consents to speak with the officers and, interrelatedly, whether the police exceed the scope of the limited intrusion without a valid consent from the suspect.[1] Recapping the facts of this case in light of Mendenhall and Royer, I would find as follows:
(1) The police have a right to speak to anyone; yet, no one is required to answer. Florida v. Royer, supra at 1324; Dunaway v. New York, 442 U.S. 200, 210 n. 12, 99 S.Ct. 2248, 2255 n. 12, 60 L.Ed.2d 824 (1979); Terry v. Ohio, supra 392 U.S. at 32-33, 88 S.Ct. at 1885-1886 (Harlan, J. concurring); State v. Brown, supra at 555 (Dixon, J. concurring). Although the officers approached Ossey at the exit, nothing indicates that Ossey's initial consent to speak with them was coerced. At this point, the incident was entirely consensual. United States v. Mendenhall, supra 446 U.S. at 555, 100 S.Ct. at 1877.
(2) Just as a person may consent to speak with police officers, he may also consent to a search after being initially approached. Florida v. Royer, supra 103 S.Ct. at 1326; United States v. Watson, 423 U.S. 411, 424-25, 96 S.Ct. 820, 828-29, 46 L.Ed.2d 598 (1976). See also State v. Watson, supra 416 So.2d at 920. Here, the officers testified that they asked for such consent and told Ossey that he did not have to consent if he did not wish to. Ossey's response, undisputed by the officers, was to ask them if they had a search warrant, saying, in effect, that he would not permit a search without a warrant. Since the officers did not have a search warrant, they were obliged at that point to break off the investigatory stop. The limits of a permissible, nonintrusive Terry -stop had been reached.
(3) The officers, however, did not do so. They persisted in seeking to confirm their suspicions. They told Ossey they would get a warrant if he would accompany them to their office. They do not indicate in their testimony what Ossey said, but it is significant that one of the officers grabbed Ossey's bag. It is not necessary to believe Ossey's testimony that they said "Let's go," while grabbing his bag, to conclude, as a matter of law, that these circumstances *292 amounted to a "show of official authority such that a reasonable person would have believed he was not free to leave." Florida v. Royer, supra 103 S.Ct. at 1326; United States v. Mendenhall, supra 446 U.S. at 554, 100 S.Ct. at 1877. What the officers claim they would have done if Ossey had attempted to leave at this point is irrelevant in making this determination. United States v. Mendenhall, supra at 554 n. 6, 100 S.Ct. at 1877 n. 6. The officers confronted Ossey just as he was leaving the airport. After he answered some questions, they identified themselves as narcotics agents, and told him they suspected him of transporting narcotics. When he refused to consent to a warrantless search, they grabbed his bag and said they would get one if he came along. Although the officers testified that they told Ossey, before he refused, that he did not have to consent to a search, neither testified that they told Ossey at this point that he did not have to accompany them or that he was free to go. Whitehead indicated he believed that Ossey came along voluntarily; Ossey said he went along without saying anything because he did not think he was free to leave. It is at this point that the majority and the courts below fall into error.[2] As a matter of law, Ossey, like Royer, was justified in believing he was not free to leave at this point, and, as a practical matter, Ossey, like Royer, was probably under arrest at that point. Florida v. Royer, supra 103 S.Ct. at 1327, 1330 (Powell, J. specially concurring).
(4) Even if Ossey was not under arrest when the three of them headed for the office, the arrest-like nature of his detention became quite clear when they arrived at the office. There is no evidence in the record that Ossey threatened the officers in any way. Moreover, the officers had continually observed Ossey since deplaning, knew that he could not have had a weapon on the plane, and knew that he had not gotten one in the interim. Nevertheless, when they arrived at the office, allegedly due to their concern for their own self-protection, the officers patted Ossey down and had him empty his pockets. As a result, they discovered the key to his bag. Ossey was clearly under arrest by this time.
(5) Once these events had occurred, the bounds of a permissible, limited intrusion had been overstepped. As a matter of law, any consent given by Ossey ought to be held to be impermissibly tainted by his illegal detention.[3]Florida v. Royer, supra 103 S.Ct. at 1326, 1329; Dunaway v. New York, supra 442 U.S. at 218-19, 99 S.Ct. at 2259-60; State v. Saia, 302 So.2d 869 (La. 1974). Ossey, unlike the defendant in State v. Watson, supra at 920, did not consent to the search in a public concourse, but only after he had been illegally detained without probable cause. As was the case in Royer, "[w]hat had begun as a consensual inquiry in a public place had *293 escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." Florida v. Royer, supra 103 S.Ct. at 1327. Accordingly, the evidence seized as a result of his illegal detention and illegal search (which yielded the key) should have been suppressed.
NOTES
[1] 433 So.2d 171 (La.1983).
[2] 435 So.2d 1039 (La.App. 5th Cir.1983).
[3] 436 So.2d 1167 (La.1983).
[4] One of the surrounding circumstances remains unresolved. It is unclear when defendant's ticket and license were returned to him. It is significant that defendant did not testify that the agents kept these items when they asked him to accompany them. Even if the agents had possession of the ticket and license when the request was made, this would not affect the finding of voluntariness. Due to the appropriate weight entitled to the trial judge's finding of fact and our independent review of the totality of circumstances, we still could not say that the trial judge's finding of voluntariness was in error.

An additional surrounding circumstance, the fact that Agent Hurley carried defendant's bag to the office, is of no moment. This does not affect the voluntariness of defendant's consent to go with the agents. Moreover, it should be noted that since the agents reasonably believed the bag contained narcotics they could have briefly detained the luggage to investigate the circumstances that aroused the suspicion by means that are properly limited in scope, such as an exposure to a narcotics detection dog. See United States v. Place, ___ U.S. ___, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
[5] This is the point at which this case differs factually from Florida v. Royer, supra. Royer implicitly found that the accused did not voluntarily accompany the Dade County detectives to the room off of the concourse. The issue then became whether, within the scope of a temporary detention, the detectives could compel Royer to follow them and to be subjected to interrogation in a small private room. The Court held that this exceeded the bounds of a permissible stop. Whereas, in the instant case, defendant voluntarily went with the agents. Therefore, due to the different factual findings on voluntariness, the holding in Royer is inapposite. This case is more closely analogous to United States v. Mendenhall, supra, in which the Court found that Mendenhall voluntarily accompanied the agents to an airport office.
[6] An oral consent to search is sufficient; a written consent is not required. Cf. State v. West, 408 So.2d 1114 (La.1982); State v. Turnbull, 377 So.2d 72 (La.1979) (written waiver form not required for a valid waiver of Miranda rights). Therefore, defendant's ruse whereby he pretended to sign the consent form did not affect the validity of his prior oral consent.
[7] The method by which the agents obtained the key used to unlock defendant's bag is unclear. However, even assuming that the key was unlawfully obtained, the drugs would not be suppressible. The alleged illegal seizure of the key did not affect the validity of defendant's consent to the search. It only facilitated the opening of the bag. Hence, the search of the bag pursuant to defendant's valid consent was not sufficiently affected by the alleged illegal seizure of the key to justify suppression of the evidence.
[1] Airport encounters do, of course, represent descriptively a "discrete category" of search and seizure cases. Nevertheless, there is no reason to conclude that drug related searches in airports should not be subjected to the same scrutiny as in other areas, although Justice Powell appears to think so. United States v. Mendenhall, supra 446 U.S. at 561-62, 100 S.Ct. at 1880-81 (Powell, J. concurring); Florida v. Royer, supra 103 S.Ct. at 1329-30 (Powell, J. concurring). Accordingly, the views of the Fifth Circuit Court of Appeal on this subject which are expressed at 435 So.2d 1041 (La.App.1983) should be rejected. The Fourth Amendment protects "people, not places." United States v. Mendenhall, supra 446 U.S. at 550, 100 S.Ct. at 1875 (citing Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)).
[2] In spite of a similarly barren record as to what was specifically said when the officers in Mendenhall asked her to accompany them to their office for further questions, the federal district court in that case specifically found that Mendenhall accompanied the officers "voluntarily in a spirit of apparent cooperation" and cited Sibron v. New York, 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). See United States v. Mendenhall, supra 446 U.S. at 557, 100 S.Ct. at 1879. The plurality opinion affirmed only after finding nothing in the record which would indicate otherwise. Id. at 557-58, 100 S.Ct. at 1878-79. In this case, however, as in Royer, the record, viewed objectively in light of all the circumstances, does indicate otherwise. The confrontation occurred at the exit to the airport, and the trip to the office occurred after Ossey had refused to consent to a search and after his bag had been grabbed from beside his feet by an officer.
[3] As in Royer, it is significant that the officers did not formally arrest Ossey until the drugs were found. Florida v. Royer, supra 103 S.Ct. at 1329. It was not until then that they had probable cause to arrest. The trial court's finding that the consent to search in the interrogation room was voluntary would render the evidence admissible only if there was probable cause to be holding him there in the first place, or if he had voluntarily accompanied the officers to their office. There was no probable cause, and his going to the office was not voluntary. The issue of Ossey's ruse in purporting to sign the consent form and the officers' subsequent good faith is therefore irrelevant, given the illegal nature of Ossey's detention.