BOWEN, Presiding Judge.
Billy Joe Brannon was convicted for the murder of Greg Pruitt and sentenced to life imprisonment. On this appeal from that conviction he contends that his arrest was illegal and the result of an illegal entry and search by the police. We disagree.
Viewing the evidence in the light most favorable to the prosecution, as we are required to do, Faircloth v. State, 471 So. 2d 485 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, 471 So.2d 493 (Ala.1985), we find that the evidence presented by the State shows that, on the night of December 20,1986, the defendant, aided and accompanied by Michael Hunt, shot and killed Greg Pruitt. The body was dumped into Aurora Lake near the “Tain’t Much Dam.” Around midnight, the defendant returned to the Mobile home of Tabatha Moore. Miss Moore was the defendant’s girlfriend and he had been staying there three to five nights a week. When the defendant returned after killing Pruitt, Kim Harper and her husband were present at Miss Moore’s trailer.
At trial, Mrs. Harper testified that the defendant “was covered with blood.” She stated that the defendant told her, her husband, and Miss Moore how he and Hunt had killed Pruitt and disposed of the body.
The Harpers left the trailer about 1:00 the next morning, Sunday, December 21, 1986. Mrs. Harper testified that she called the Boaz Police Department and told them what the defendant had told her. Later, she talked to officers from the Albertville Police Department.
Albertville Police Officer Ronald Can-field was dispatched to the dam at approximately 5:23 that same Sunday morning. He discovered what appeared to be blood on the road leading to the dam and sealed off the area.
Around 6:30 that morning Albertville Police Chief of Detectives Tommy Cole and Captain Darrell Childress went to Miss Moore’s mobile home. Earlier, Cole had been by the dam and observed two spent shells from a high powered rifle lying in a pool of blood. Detective Cole testified that he went to Miss Moore’s because of information received from the radio dispatcher. He did not testify as to the specific content of that information.
He recognized Miss Moore’s car parked in her driveway. On its front seat, in plain view, he observed a high powered rifle. He also saw a jeep parked in the driveway. He testified that, from the description that previously had been given to him, he knew that the jeep belonged to the defendant.
The door to the trailer was partially open. Detective Cole knocked on the home several times and “real loud the last couple of times.” After receiving no response, he entered the trailer, identified himself, and “hollered, ‘Police. Is there anybody at home?’ ” Cole testified that he “heard what [he] believed to be a groan like, but [he didn’t] really know what it was,” walked down the hall, and “continuously hollered, let them know who [he] was, police officer, and knocked on the wall again.” Receiving no response, Cole walked to the end of the hall, repeatedly knocking and “hollering” as he went.
At the end of the hall, the bedroom door was “more opened than closed.” He entered the bedroom where he found the defendant and Miss Moore in the bed. Miss Moore was asleep. Cole observed the defendant shut his eyes, instructed the defendant to “put his hands where I could see them,” and identified himself as “Tommy Cole, police officer.” On the third request, the defendant removed his hands out from under the bed covers. The defendant then put on his blue jeans, which Cole testified appeared to be bloodstained.
*1358 During this time, Miss Moore had awakened. She addressed Cole by name and asked, “What’s going on?” Cole told her that he was there “on an investigation of what [he] believed to be a shooting.” Cole stated that he “advised her that her door was standing open and asked if they did not hear [him] when [he] was identifying [him]self and knocking and she said no.”
Cole testified, “Miss Moore asked me if she could get up and get dressed and I said sure. And Mr. Brannon got up and put his — pulled his pants on and he and I stepped out. She shut the door and she got dressed and came into the kitchen.”
Cole explained the Miranda rights to Miss Moore and the defendant. Then, in the defendant’s presence, he further explained to Miss Moore that he was “investigating a shooting, and that [he] did not have a search warrant, but [he] had reason to believe that there might be something there that [he] needed to look at. She stated that she did not have anything to hide” and indicated that she understood her rights. Miss Moore signed a consent to search form. During this time the defendant remained silent. After a search of the premises, and the seizure of some items of clothing and the rifle, the defendant was arrested. He was taken to the police station where he waived his Miranda rights and confessed to Pruitt’s murder.
Detective Cole' testified that, when he went to Miss Moore’s residence he “did not know at that time those who would later be involved,” that he did not know he was going to be arresting the defendant when he found him, and that he did not enter Miss Moore’s home with the intent of arresting the defendant. When Detective Cole went to Miss Moore’s trailer, Pruitt’s body had not been recovered. Cole stated that he was “not positive for sure that the crime had been committed.” Cole also testified that he did not search the mobile home until after Miss Moore had given her consent.
The trial judge stated his reasons for denying the defendant’s motion to suppress on the basis of an illegal arrest:
“Also, the evidence in the case shows that the purpose of the officer going to the house was not for an arrest, but for an investigation of a crime. He had no purpose of being there for an arrest. “It was pointed out or argued by the Defendant that the officer going into the mobile home was trespassing. The Court is of the opinion, and certainly of a personal opinion as well as a legal opinion, that if an officer came to the Court’s house and found the door open and the lights out and no response after all that warning, the Court would feel that it would be good police practice to determine if there is something wrong in the house.
“The Court is of the opinion that the officer’s intrusion into the house, entrance into the house, was not a trespass, but merely to determine whether or not people were dead, people were hurt, people were unconscious. And the Court can only commend the officers for that entrance.
“Also, the Court determines that the officer received a consent form from the owner of the mobile home, from Mrs. Moore, and determines that the search of her property would have been consented to. Also, although it has not been offered at this time, the Court is going to make a determination that the rifle, if offered, will be admitted unless there is something that has not been shown in view of the fact that the rifle was in plain view and was able to be seen by the officer without any intrusion.”
“In the absence of exigent circumstances, the authority to make a warrantless arrest ends at the threshold of a private dwelling and the police may not make a warrantless, nonconsensual entry into a suspect’s home to effectuate a routine felony arrest. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).” Youtz v. State, 494 So.2d 189, 192 (Ala.Cr.App.1986). Here, the police went to Miss Moore’s residence to investigate a recent murder.
“It is not improper for a police officer to call at a particular house and seek admis *1359 sion for the purpose of investigating a complaint or conducting other official business. If admission is voluntarily granted by a person who is in a position to give such effective consent, then the policeman may enter and make observations while therein consistent with the scope of the permission he was given. But the mere fact that the door of the house is opened in response to the officer’s knock or ring does not mean that the officer is entitled to walk past the person so responding into the interior of the residence. Nor may the officer enter the home when there is no response at all. As stated in State v. Crider [341 A.2d 1, 4 (Me.1975) ]:
“It is not unreasonable for police officers, in the pursuit of criminal investigations, to seek interviews with suspects or witnesses at their homes, but their right to call upon them at their homes for such purposes does not include the right to walk in uninvited merely because there is no response to a knock or a ring.”
W. LaFave, 1 Search and Seizure § 2.3(b) at 387 (2nd ed. 1987).
See also State v. Boilard, 488 A.2d 1380, 1385 (Me.1985) (“But this right to call at the home does not include the right to walk in against the wishes of the person in possession or in control of the premises.”).
The circumstances in this case are an exception to this general rule. We agree with the trial judge that the police officers’ entry into Miss Moore’s mobile home, under the circumstances of this case, was “good police work.” Here, the police had every reason to believe that a violent and brutal crime might have been recently committed within 1½ miles of Miss Moore’s trailer, which was located in a rural part of the county. The police had information that the defendant was involved and they discovered his jeep parked outside Miss Moore’s trailer. The door to the trailer was open and the officers received no response from inside the trailer, even after repeated knocking and “hollering.” It is generally recognized that a warrantless search of premises may be justified because of a risk of harm or even death to an individual. 2 Search and Seizure § 6.5(d).
Even a consent to search obtained after an illegal entry will be considered valid if it was the product of free will and not the result of exploitation of the previous illegality.
“One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving the consent was given freely and voluntarily. State v. Ossey, 446 So.2d 280 (La.1984); State v. Wolfe, 398 So.2d 1117 (La.1981). In addition, if the consent was obtained after an illegal detention or entry, the consert was valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. State v. Zielman, 384 So.2d 359 (La.1980); State v. Bennett, 383 So.2d 1236 (La.1980) (on rehearing); State v. Ragsdale, 381 So.2d 492 (La.1980).” State v. Owen, 453 So. 2d 1202, 1206 (La.1984).
See also 3 Search and Seizure at § 8.2(d).
The evidence of Miss Moore’s voluntary consent was undisputed. Miss Moore did not testify and the defendant testified that he was not present when she consented to the search of her home.
It is arguable that the warrantless, non-consensual entry into Miss Moore’s trailer was justified by probable cause and exigent circumstances. However, given our finding that there .was a valid consent search, we need not reach that issue.
*1360 The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.