BOWES, Judge.
Defendant, Olga Moreno, has appealed following a guilty plea pursuant to State v. Crosby, 338 So.2d 584 (La.1976). She was charged by bill of information with possession of a controlled dangerous substance, to-wit: cocaine. (LSA-R.S. 40:967). At arraignment she pled not guilty. Subsequently, the state amended the bill of information to charge the defendant with possession of over 400 grams of cocaine. After the defendant filed a motion to suppress the trial court held a suppression hearing; however, at the conclusion of the state’s case the defense moved for a recess. The trial court granted the recess until September 17, 1990. On that day the trial court ordered the motion to suppress to be submitted on memorandum and later denied the motion. Following this Court’s denial of defendant’s writ application the defendant withdrew her former plea of not guilty and pled guilty as charged while reserving her right to appeal the denial of her motion to suppress in accordance with State v. Crosby, supra. Thereafter, the trial court sentenced the defendant to fifteen years at hard labor and fined her $250,000.00 plus court costs. On appeal she urges that the trial court erred in denying her motion to suppress the narcotic evidence.
FACTS
On May 7, 1990 Sergeant Jerry Simone and his partner, Agent Cummings, were detailed to conduct surveillance of arriving flights from source cities for narcotics. One such flight was American Airlines flight 1076 arriving from Miami.
When flight 1076 arrived the officers noticed the defendant, Olga Moreno, deplane and proceed up the concourse alone in a “very hurried fashion.” She was carrying a small purse and a small carry-on bag. As she walked along the concourse she repeatedly looked nervously over her shoulder and from side to side. After observing this demeanor the officers placed her under surveillance.
As the defendant proceeded down the concourse the officers followed her remaining several feet behind. Upon reaching the lobby she headed downstairs towards the baggage claim area, still looking over her shoulder. She proceeded through the baggage claim area without claiming anything, which the officers found unusual considering the small amount of baggage she had carried on with her. She then exited the airport. The officers found the totality of her conduct as described above to be unusual and suspicious and fitting the elements of the so called “drug profile” exhibited by persons smuggling in contraband.
Consequently, thereafter, the officers approached her, identified themselves as police officers and asked if she would speak to them for a moment. She agreed. Sergeant Simone questioned her as to her point of departure, to which she responded that she had left from Miami, Florida, a well known departure point for drug carriers. Sergeant Simone then asked her to produce her airline ticket and some form of identification. She handed the officer an American Airline seating assignment stub for seat 22-A and an identification card. After examining the documents, Sergeant Simone noticed that the seating assignment stub was issued in the name of “Perez” while the identification card was issued to “Moreno.” When questioned about the discrepancy, the defendant explained that she had purchased the ticket from a man at the airport in Miami — an unlikely and unusual method of obtaining a ticket and not believed by the officers.
*826 At this point, Moreno informed the officers that she did not understand English well, so they stopped the questioning temporarily and asked her to step inside the airport where an interpreter could be found. She agreed. The officers then led her to the nearby Southwest Airline baggage claim office where Sergeant Simone contacted Mr. Reese of Southwest Airlines, who speaks fluent Spanish, to assist. Mr. Reese repeated the previous questions and the defendant responded the same answers as before. In response to further questioning through the interpreter, Moreno informed the officers that she had been in Miami visiting friends for about three weeks.
In order to obtain more information Sergeant Simone proceeded to the American Airlines baggage claim office with the defendant’s seating assignment stub and identification card, leaving the defendant with Agent Cummings still at the Southwest Airlines office. At American he learned that seat 22-A, in which the defendant had been seated, had been assigned to one Vilma Perez, while seat 22-B had been assigned to a Susanna Perez, and that travel arrangements for both had been made through the AA travel agency in Miami at the same time. Sergeant Simone testified that this information strongly suggested to him that Moreno and Susanna Perez were travelling together.
After returning to the Southwest Airlines baggage claim officer, Sergeant Simone questioned the defendant, through the interpreter, concerning Susanna Perez; however, Moreno indicated that she did not know Susanna Perez and she was travel-ling alone. This did not appear to be true and thus one more suspicious circumstance was added to the defendant’s unusual flight history. Sergeant Simone, through the interpreter, then asked Moreno for consent to search her carry-on bags. She agreed and responded by handing the bags to the officers and saying, “Go ahead. No problem.”
Sergeant Simone searched the purse and carry on bag finding several pairs of shoes, a pair of shorts and some perfume in the carry-on bag. No contraband was discovered in either. When questioned about the “small amount of clothing and toiletries” the defendant simply stated that she had left her belongings at a friend’s house. This statement was also suspicious, since defendant had previously stated that she was returning from visiting friends for three weeks. Surely she needed clothes and toiletries during her visit. Sergeant Simone then asked the defendant if she would consent to a search of her person and she replied directly — in English — without the interpreter, “You’re going to have to get a paper to search me.” Thereafter, Sergeant Simone informed her that she was being detained and that she would have to accompany them to their office located on the second floor of the airport until a search warrant was obtained.
The officers proceeded to start walking with the defendant toward their office in the airport. As they walked towards the lobby Sergeant Simone informed the defendant of her Miranda rights, including the right to remain silent. Upon approaching the American Airlines ticket counter in the lobby, they stopped; and Sergeant Simone stepped towards the counter in order to obtain information concerning the flight number on which Moreno had travelled and its arrival time, information needed for the application for the search warrant. While Sergeant Simone was at the counter the defendant asked Agent Cummings, “Where are we going”? After Agent Cummings informed her that they were going to their office in the airport to prepare a search warrant, without any pressure or persuasion the defendant suprisingly volunteered: “You don’t have to get the paper, I’ll give you the coke.” Agent Cummings asked, “Give me what?” and the defendant replied, “The cocaine.”
Agent Cummings then entered the ladies’ restroom near their office with the defendant and, when the two women emerged, Agent Cummings showed Sergeant Simone a rectangular shaped packet wrapped in blue tape which had been voluntarily given to her by the defendant and which the record shows later proved to contain 1194 grams of cocaine. The value *827 of this contraband was not stated, but the record reveals that the defendant’s bail was set at $1,000,000.00.
Thereafter, the defendant was informed that she was under arrest. She was taken to a police unit where Sergeant Simone performed a preliminary field test on a small portion of the white powder contained in the package and the test yielded a positive result for cocaine.
At the hearing on the motion the uncon-tradicted testimony of Sergeant Simone shows that when they were going to find an interpreter (for the benefit of Ms. Moreno), she stepped inside the airport with the officers voluntarily and proceeded towards the Southwest baggage claim office with them voluntarily to where the passengers pick up their baggage; and that she was not held or physically detained in any manner. She just voluntarily walked with them. From their conversation and the preceding circumstances, the officers already strongly suspected the defendant of criminal activity. However, when Sergeant Simone returned to the baggage claim office with the additional very suspicious information regarding the defendant’s obtaining of the “Perez” tickets, as well as the name and seating discrepancies, combined with the refusal of defendant to consent to the search of her person, after having given consent to the carry-on baggage search, he felt that the totality of the circumstances, observations and information thus far obtained cast sufficient suspicion upon Olga Moreno that a reasonable person would conclude she was involved in drug trafficking. Therefore, at that point, he had a legal right and probable cause to detain her.
Defendant contends that at the time she consented to the search of her person she was being illegally detained beyond the limits of a permissible investigatory stop.
ANALYSIS
It is axiomatic that citizens are protected against unreasonable searches and seizures and invasions of privacy by the Fourth Amendment to the United States Constitution and Article 1, Section 5 of the Louisiana Constitution.
Airport interaction between police officers and citizens generally falls into three categories: consensual encounters, investigatory detentions, and arrests. Each level of interaction necessitates an increasing knowledge of articulable facts justifying a belief that criminal activity has occurred or is about to occur. Effecting an arrest or investigatory detention without the requisite cause will result in suppression of evidence seized during the detention.
The defendant argues in this case that her detention was not justified by the artic-ulable facts known by the officers at the time she was detained and thus both the seizure of her person and the drugs she carried were proscribed by the Fourth Amendment.
In State v. Davis, 547 So.2d 1367 (La.App. 5 Cir.1989) this Court engaged in extensive discussion of airport detention cases up to and including U.S. v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Much of our discussion in that case was devoted to the investigatory detention phase of the defendant’s case and whether or not it was a permissible stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In Terry, the United States Supreme Court held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, supported by articula-ble facts, that criminal activity “may be afoot,” even if the officer lacks probable cause.
In United States v. Sokolow, supra, the Supreme Court stated the following concerning reasonable suspicion:
The Fourth Amendment requires ‘some minimal level of objective justification’ for making the [Terry ] stop. INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means ‘a fair probability that contraband or evidence of a crime will be found,’ Illinois v. Gates, *828 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause. See United States v. Montoya de Hernandez, 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 3310, 3312, 87 L.Ed.2d 381 (1985).
The concept of reasonable suspicion, like probable cause, is not ‘readily, or even usefully, reduced to a neat set of legal rules.’ Gates, supra, 462 U.S., at 232, 103 S.Ct., at 2329. We think the Court of Appeals’ effort to refine and elaborate the requirements of ‘reasonable suspicion’ in this case create unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider ‘the totality of the circumstances — the whole picture.’ United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). As we said in Cortez:
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same — and so are law enforcement officers.
Id., at 418, 101 S.Ct., at 695.
United States v. Sokolow, 490 U.S., at 7-8, 109 S.Ct., at 1585.
In interpreting Sokolow, this Court stated in State v. Davis:
A fair reading of the Sokolow opinion indicates that the specific and articulable facts to which a law enforcement officer must be able to point in justifying an investigatory stop are to be evaluated in light of all circumstances surrounding the particular incident. A court’s inquiry into the existence of reasonable suspicion should entail practical consideration of the cumulative effect of all facts articulated by the officer, further taking into account the probative value of such facts to the trained law enforcement official observing them.
The predicate permitting seizures on suspicion short of probable cause is that the law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted may vary to some extent with the particular facts and circumstances of each case but the investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
However, not all encounters between the police and citizens amount to Fourth Amendment seizures. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may a court find that a seizure has occurred. Terry v. Ohio, supra.
In Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), the Supreme Court adopted the Mendenhall test, formulated by Justice Stewart’s opinion in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980): “A person has been ‘seized’ within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” United States v. Mendenhall, 446 U.S., at 554, 100 S.Ct., at 1877.
In the instant case the initial approach of the defendant by the officers certainly did not constitute a seizure. The officers did not summon the defendant to their presence but instead approached her while she was in a public area. The officers identified themselves as such and asked if she would object to speaking to them. Moreno freely agreed to talk to the officers. There was no coercion of any kind by the officers and no indication that she was not free to disregard the encounter and walk away. United States v. Menden- *829 hall, supra, State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, Belton v. Louisiana, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). The fact that Simone and Cummings identified themselves as police officers did not convert this consensual encounter into a seizure. State v. Ossey, 446 So.2d 280 (La.1984), cert. denied, Ossey v. Louisiana, 469 U.S. 916, 105 S.Ct. 293, 83 L.Ed.2d 228 (1984).
Similarly, the defendant voluntarily agreed to accompany the officers to the Southwest Airlines baggage claim office to obtain the assistance of an interpreter. The officers asked her to step inside the airport where an interpreter could be found and she agreed. There were neither threats nor any show of force by the officers and the baggage claim office is open to the public.
There was abundant reasonable suspicion to justify the defendant’s original temporary stop. The defendant had arrived from a source city for narcotics, which was therefore, also a very frequent departure place for drug trafficking; she was visibly nervous and displaying many of the attributes of a guilty narcotics smuggler as she hurriedly walked down the concourse looking back and from side to side many times; she was travelling under circumstances of what certainly appeared to be an assumed name; and she had no baggage to claim and only a very small “carry-on” bag. Furthermore, the investigative methods employed by the officers were only minimally intrusive and were calculated to quickly confirm or dispel the officer’s suspicions.
As a practical matter, the defendant was not seized or under arrest until after she refused to consent to the search of her person. Sergeant Simone testified that at that point she was being detained. He informed her of such and that she would have to accompany them to their office in the airport until a search warrant was obtained. Those facts indicate an intent to effect an extended restraint on the defendant’s liberty which constitutes an arrest. See State v. Raheem, 464 So.2d 293 (La.1985).
A police confinement which goes beyond the limited restraint of an investigatory stop may be constitutionally justified only by probable cause. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Probable cause to arrest without a warrant exists when the facts and circumstances known to the arresting officer and of which he has reasonable trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Raheem, supra. Probable cause must be judged by the probabilities and practical considerations of everyday life on which average men, and particularly'average police officers, can be expected to act. State v. Raheem, supra.
At the time of her final detention (when she initially refused a body search), the officers knew that the defendant was a young Hispanic woman, arriving from a drug source city with only a purse and carry-on bag walking from the airplane in a manner so hurried and nervous that it attracted their attention. She was travelling under what appeared to be an assumed name and was unable to produce an airline ticket in her name. She had only a boarding pass in a Hispanic name that was different from the name she produced as evidence of identification. Her explanation as to her acquisition of her flight ticket and the name discrepancy was improbable and implausible. The officers knew that her travel arrangements had been made through the same agency at the same time as those of her seat mate, Susanna Perez, signalling that the defendant was under an assumed name and travelling with someone although she claimed to be travelling alone. Her response to the question as to the reason that she had virtually no clothing in the sparse contents of her carry-on bag did not amount to a logical explanation or answer to a reasonable question and was for all intents and purposes, an evasion. Logic would dictate that if, as she initially said, she had been “visiting friends in Florida for a few weeks,” and was presumably *830 returning home, she would have brought her clothes home with her. They would not be at the home of still another “friend.” Finally, her clear and quick response to the officer’s request for a body search evidenced a much better command of the English language than she had previously attempted to display. All of these circumstances indicated deception on Moreno’s part.
We find that these facts and circumstances viewed and considered by experienced police officers, justified the belief that the defendant was carrying contraband drugs and had committed a crime. The “totality of the circumstances” standard, (See Sokolow, supra), with emphasis on the officers’ considerable law enforcement experience of eleven and one-half years and specific training in flight surveillance, compels us to conclude that the officers had probable cause to believe that Moreno was committing a crime (smuggling in narcotics) and that the arrest and seizure of defendant was lawful.
Because the arrest was lawful, evidence discovered as a result thereof is legally obtained and therefore admissible.
VOLUNTARY CONSENT TO SEARCH OR TO RELINQUISH COCAINE
As we stated in Davis, supra:
The question whether appellant’s consent to the search was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Ossey, 446 So.2d 280 (La.1984); State v. Wiley, 507 So.2d 841 (La.App. 5 Cir.1987).
In addition to our conclusions above, the record also amply suggests the valid conclusion that the defendant voluntarily relinquished the narcotics making a forced search and search warrant unnecessary. Apparently, the defendant did not understand or realize after refusing the body search, that she was being escorted to the airport office of the officers where they would prepare an application for a search warrant because on the way she asked “Where are we going?” and when told by Officer Cummings that their destination was the officers’ office to obtain a search warrant she immediately informed them, without any prompting, persuasion or coercion of any kind whatsoever, that a search warrant would NOT be necessary because “I’ll give you the coke” (voluntarily). “Give us what” Officer Cummings asked. “The cocaine” replied the defendant.
Considering the entire conversation between the officers and the defendant and the totality of the circumstances involved we find this to be a completely unexpected, uncoerced, extemporaneous and voluntary admission by the defendant that she was possessing cocaine and that she wished to voluntarily surrender it to the authorities.
In our opinion, this action on the part of the defendant under these circumstances, subsequent to arrest, constitutes a complete change of mind and an absolutely voluntary acquiescence in turning over the cocaine to the officers of her own free will and volition, thus negating the necessity for a search warrant. This is an entirely independent and valid ground for the validity of the evidence and for affirming the trial judge’s decision to deny the motion for suppression.
Accordingly, considering all the above facts and circumstances, we find no abuse of discretion in the denial of the motion to suppress.
ERROR PATENT DISCUSSION
Additionally, we have reviewed the record for errors patent in accordance with guidelines in State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. McGee, 527 So.2d 486 (La.App. 5 Cir.1988).
A review of the record reveals the following errors.
The record fails to show that the defendant was rearraigned on the amended charge. LSA-C.Cr.P. art. 555 provides that a failure to arraign the defendant is waived if the defendant enters upon the trial without objection thereto. Although the defendant did not proceed to trial she *831 did plead guilty to the amended charge without objection. Consequently, we find that the rearraignment was waived. Moreover, no prejudice resulted to the defendant. See State v. Clark, 466 So.2d 686 (La.App. 3 Cir.1985).
The defendant’s sentence is illegally lenient. LSA-R.S. 40:967(G)(1) provides that the court must withhold the benefit of parole, probation or suspension of sentence for a period equal to the minimum sentence under section (F), i.e., the first fifteen years. Here, the court failed to withhold the benefit of parole, probation or suspension of sentence for any term. However, when the state fails to raise the issue by motion or argument to the court the error will not be corrected on appeal. State v. Fraser, 484 So.2d 122 (La.1986); State v. Mayeux, 556 So.2d 142 (La.App. 5 Cir.1990), writ denied, 564 So.2d 315 (La.1990).
For the foregoing reasons the conviction and sentence are affirmed.
AFFIRMED.