[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 465 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 466 
The appellant, Randall Lee Whitt, was indicted on December 8, 1994, in Madison County, in a two-count indictment. Count One charged the capital offense of murder committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975, and Count Two charged the offense of attempted murder, see §§ 13A-4-2 and *Page 467 13A-6-2. The indictment reads, in pertinent part, as follows:
"Count One:
 "The Grand Jury of said County charge . . . Randall L. Whitt . . . did intentionally cause the death of James Maples by shooting him with a firearm, and Randall L. Whitt . . . caused said death during the time that Randall L. Whitt . . . was in the course of committing a theft of property, to-wit: a purse and its contents, belonging to Mary Humphries, by the use of force against the person of James Maples, with intent to overcome his physical resistance or physical power of resistance, while the said Randall L. Whitt . . . was armed with a deadly weapon, to-wit: a firearm, in violation of Code of Alabama 1975, § 13A-5-40(a)(2). . . .
"Count Two:
 "The Grand Jury of said County charge . . . Randall L. Whitt . . . did, with intent to commit the crime of Murder (Section 13A-6-2 of the Code of Alabama) attempt to commit said offense by shooting Mary Humphries with a firearm, in violation of § 13A-4-2 of the Code of Alabama. . . ."
At arraignment, the appellant pleaded not guilty, and on August 29, 1996, a jury found him guilty of both counts as charged in the indictment. The state made it known at the beginning of the trial that it would not seek the death penalty, therefore no sentencing hearing, pursuant to §§ 13A-5-43 through -46, was held before the jury in reference to the capital conviction. After a sentencing hearing before the trial court, the court sentenced the appellant on November 1, 1996, as follows: On Count One, the capital offense of murder committed during a robbery in the first degree, the appellant was sentenced to life imprisonment without the possibility of parole, was fined $1,000, and was ordered to pay $1,000 to the victims compensation fund, all court costs, and the attorney fees of any court-appointed attorney. On Count Two, the offense of attempted murder, he was sentenced to life imprisonment, was fined $1,000, and was ordered to pay $1,000 to the victims compensation fund, all court costs, and the attorney fees of any court-appointed attorney.
The state's evidence showed that David Anthony Coffman and the appellant had visited the appellant's former girlfriend, Nancy Denise Guerin, at her mother's mobile home on the morning of August 15, 1994; that they were traveling in Coffman's older model, white pickup truck; and that both men were armed with pistols. Nancy's brother, James Kevin Guerin, who was also present, overheard Coffman say during a telephone conversation that "he had to hurry up and go, they had to rob somebody." The appellant was standing near him and Coffman when Coffman made the statement. Nancy heard Coffman, after talking on the telephone, say to the appellant, "We need to go. We got business to take care of." Immediately after these statements, Coffman and the appellant left in a hurry. (James Guerin testified they left between 12:30 and 1:00 p.m.; Nancy Guerin testified that they left between 12:30 and 12:45 p.m.).
The state's evidence further showed that, before the incident out of which this case arose, Mary Arminda Humphries and James Murray Maples had been seeing each other for several months and that, during that time, they had met on about 15 occasions behind the Flint River Primitive Baptist Church in rural Madison County. The evidence further showed that they planned to meet at the church around 1:00 p.m. on August 15, 1994; that Humphries arrived first, shortly after 1:00 p.m., parked her automobile behind the church, and sat on the church steps waiting for Maples; that shortly thereafter, what she described as an older model, noisy, white pickup truck with two persons in it came around the church and pulled up within five feet of her; and that the passenger in the truck leaned over and asked, "Have you seen a nigger in a brown Cadillac?" *Page 468 
Humphries answered that she had not, and the truck pulled away. (At photographic lineups and at the trial, she positively identified the driver of the truck as being Coffman and the passenger as being the appellant. Concerned, she got back in her automobile and waited for Maples. A few minutes later Maples arrived. They got out of their respective automobiles and greeted each other. Then Humphries heard and saw the same noisy, white pickup truck approaching the church. She heard the truck stop and the motor cut off, and immediately thereafter saw two men approaching them on foot. According to her, they were the same two men who had earlier approached her in the truck while she was sitting on the church steps. Coffman came directly to them, stopped about five feet from them, and stood with his hands on his hips, looking at them. The appellant, who stood about 10 feet behind and to the side of Coffman, said, "Have you seen a nigger in a brown Cadillac?" Maples said, "No, we haven't. That's why we come back here. This is private." The appellant then pulled a pistol from his belt and started firing at Humphries and Maples, as he advanced on them. After Maples shoved Humphries to the ground and ran, the appellant stood at her feet, pointing the pistol in her face. She begged him not to kill her, and she put her hand up to shield her face, but the appellant fired directly at her. The bullet went through her hand. She then lay still and pretended she was dead. She then heard someone (whom she believed to be Coffman) say, "Make sure that son-of-a-bitch is dead." Then someone (whom she believed to be the appellant) grabbed her by the hair, lifted her off the ground and struck her in the head with a heavy object, causing her to lose consciousness. When she regained consciousness and saw no one around, she began looking for Maples. She found him lying nearby, unable to breath and bleeding from the mouth and nose, from what appeared to be a gunshot wound. Determining that she could not help him, she ran to the road, flagged an automobile, went to a nearby house, and telephoned the police.
It was subsequently determined that Maples suffered a gunshot wound; that the wound caused his death; and that he died at the scene. The bullet was never recovered. Humphries suffered a gunshot through her hand, a grazing gunshot wound to a knee, and lacerations to her head caused by a blunt instrument.
The investigation disclosed that Humphries's purse was missing. A short time later, her Alabama driver's license, several of her identification and credit cards, and personal photographs that had been in her purse, along with her purse, were found along the roadside some distance from the scene of the incident.
As a result of the descriptions of the suspects and the truck furnished by Humphries, Coffman was stopped by the police about 3:00 p.m. on the same day, while driving the truck, and was subsequently arrested and charged with the crimes.[1] Around 4:00 p.m. on the day of the crimes, the appellant telephoned Nancy Denise Guerin and told her, "I already killed a man and shot a woman." The appellant called her again later that day and said, "We killed a man and shot a woman." At trial, Guerin testified that she has received several letters from the appellant since his arrest in this case, and in each letter he claims that he is innocent and places the *Page 469 
full blame for the crimes on Coffman. Around 7:00 p.m., the police were called to a mobile home park to investigate a disturbance involving the appellant. It had been reported that he had been firing a pistol. After he was arrested, it was discovered that he had a pistol and live ammunition in his possession, as well as some of Humphries's identification cards. These were seized by the police. It was subsequently determined by a ballistics expert that the pistol seized from the appellant was the same pistol that had fired the bullet that had been recovered from Humphries's automobile and also had fired one of the five spent shell casings that had been found at the scene. The findings as to the other shell casings found were inconclusive; that is, it could not be determined whether they had been fired by the appellant's pistol. No other pistol was recovered.
After proper Miranda[2] warnings and a waiver of rights by the appellant, he gave the officers two oral and two written statements. In the statements, he admitted being with Coffman when they approached Maples and Humphries at the church; however, he denied any involvement in the crimes. He stated that he had no knowledge that Coffman was intending to rob or to shoot anybody; that Coffman did the shooting; that when Coffman started firing his pistol, the appellant ran back to the truck; and that when he and Coffman were fleeing the scene, he discovered the purse in the truck and threw it out on the side of the road. He placed the entire blame on Coffman.
About five months after the incident, the appellant telephoned James Kevin Guerin from the jail, and he asked the appellant what had happened. The appellant told him, "[T]hey were going down through there, and David [Coffman] pulled his gun and told the man to give his money to him, and the dude was supposed to have pulled a knife on him, and David shot him. Then [the appellant] said he panicked and shot the woman."
The appellant did not testify in his defense. He called five witnesses; all were relatives. His mother testified that when the appellant left home with Coffman on the morning of the incident, he was not wearing a shirt. This was offered apparently to cast doubt on Humphries's identification of the appellant as her assailant because she had testified that the appellant was wearing a dirty, white T-shirt when she observed him at the scene. The other witnesses were character witnesses.
The theory of the appellant's defense was that although he was at the scene when the crimes were committed, he had no part in their commission and had no prior knowledge that they were going to be committed. He placed the full responsibility for the commission of the crimes on his friend Coffman and urged the jury, through his counsels' opening statement, cross-examination of the state's witnesses, and summation to the jury to consider the possibility that Coffman was a "hit man" who had been employed by someone to kill Maples and that no robbery occurred or was intended. In support of his theory, he called attention to the facts that Maples's wallet, which contained $1,400, was not taken; that Dannie Certain, an investigator with the Madison County Sheriff's Department, testified on cross-examination that Coffman had been charged twice in the past for offenses of murder for hire; and that Humphries's doctor had made an entry in her medical records that she stated that her boyfriend had been killed by hit men — a comment which she denied. Further, in support of his theory, his counsel urged the jury to question Humphries's identification of him as her assailant. Counsel pointed to Humphries's testimony that at the time of the shooting the appellant was wearing a dirty, white T-shirt and that Coffman was wearing a dark shirt; that when Coffman was arrested he was wearing a clean, white T-shirt and when the appellant was arrested several hours *Page 470 
later he was wearing no shirt at all; and that the appellant's mother testified that when he left home that morning he was not wearing a shirt.
The appellant raises 10 issues on appeal.
 I.
The appellant first contends that the guilty verdicts are contrary to the law and the weight of the evidence. From his arguments in brief, it is apparent that his issues concern the weight and sufficiency of the evidence. These issues are often argued interchangeably, even though they are distinct and separate issues. For a discussion of the legal principles involving the weight of evidence as opposed to the sufficiency of evidence, see Johnson v. State, 555 So.2d 818 (Ala.Crim.App. 1989). See also Tibbs v. Florida, 457 U.S. 31 (1982). The weight of the evidence refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other. Johnson v. State. We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. Johnson v. State, and cases cited therein. The credibility of witnesses and the weight to be given testimony is for the jury to determine. Zumbado v. State, 615 So.2d 1223
(Ala.Crim.App. 1993); Harris v. State, 513 So.2d 79 (Ala.Crim.App. 1987). On the other hand, the sufficiency of the evidence concerns the question of whether, "`viewing the evidence in the light most favorable to the prosecution, [a] rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" Johnson v. State, 555 So.2d at 819 (quoting Tibbs v. Florida, 457 U.S. at 37). In the instant case, the conflicting evidence presents a jury question, and the jury's verdicts rendered thereon are conclusive on appeal. Zumbado v. State; Johnson v. State.
The appellant contends that the state's evidence was insufficient to support his convictions. He preserved this issue for review by motions for judgments of acquittal made at the conclusion of the state's case-in-chief, at the conclusion of the presentation of all the evidence, and in a motion for a new trial. In deciding whether there is sufficient evidence to support the verdicts of the jury and the judgment of the trial court, the court must review the evidence in the light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985); Cumbo v. State,368 So.2d 871 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 283 (Ala. 1980); McBryar v. State,368 So.2d 568 (Ala.Crim.App.), cert. denied, 368 So.2d 575 (Ala. 1979). The action of the trial court in denying a motion for a judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State,447 So.2d 199 (Ala.Crim.App. 1983); Thomas v. State, 363 So.2d 1020
(Ala.Crim.App. 1978).
After examining the evidence in the instant case and applying the proper standards of review, we find that there was sufficient evidence presented by the state from which the jury could conclude beyond a reasonable doubt that the appellant was guilty of the crimes charged in both counts of the indictment, i.e., the capital offense of murder committed during a robbery in the first degree, § 13A-5-40(a)(2), and attempted murder, §§ 13A-4-2 and 13A-6-2. In fact, we find the evidence of appellant's guilt on both counts strong and convincing. There was little or no credible evidence to support a conclusion that the appellant was not involved in the commission of the crimes and that Coffman was a "hit man" of some sort, as the appellant urged in his defense. To reach such a *Page 471 
conclusion would require resort to surmise and conjecture. Although in his statements to authorities the appellant denied any knowledge that the crimes were going to be committed and any involvement in their commission, he offered no explanation in the statements as to how Humphries's identification cards happened to be in his pocket when he was arrested or why he confessed to Nancy Guerin that he had "already killed a man and shot a woman" and to James Guerin, five months after the crimes, that he "panicked and shot the woman."
Accordingly, the appellant's motions for judgments of acquittal and for a new trial on the assertion of insufficient evidence were properly denied. The submission of the case to the jury was proper. We find no merit in the appellant's contentions as to this issue.
 II.
The appellant contends that the trial court erred in admitting the testimony of Humphries, in identifying him as her assailant, because, he argues, the identification was based upon a "biased and suggestive" photographic identification procedure. He also contends that Humphries was under the influence of "painkillers" when she identified him from a photographic lineup, which, he says, rendered the identification procedure invalid. He argues that the out-of-court identification procedure was unduly suggestive and unreliable and that it therefore tainted Humphries's in-court identification.
The record shows that after Humphries had been treated in the hospital for injuries she had sustained in the incident and released, later on the same day of the incident, she viewed photographic arrays at the police station. She promptly identified the appellant as her assailant in one of the photographic arrays, and without hesitation, identified Coffman in another.
In Cochran v. State, 500 So.2d 1161 (Ala.Cr.App. 1984),[3] we reviewed the legal requirements for determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony. In Cochran, we stated:
 "There exists a due process right to the exclusion of unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Stovall v. Denno, 388 U.S. 293 . . . (1967). The primary focus in the due process inquiry is on the reliability of the identification, and identification evidence derived from an unnecessarily suggestive source need not be excluded if the totality of the circumstances indicates that it is reliable. Manson v. Brathwaite, 432 U.S. 98 . . . (1977).
 "In Manson, the Supreme Court adopted the five factors enumerated in Neil v. Biggers, 409 U.S. 188 . . . (1972), to determine the reliability of the identification: the witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention at the time of the crime; the accuracy of the witness' prior description of the criminal; the witness' level of certainty when identifying the suspect at the confrontation; and the length of time between the crime and the confrontation.
 ". . . After Manson, courts have employed a two-step analysis to determine whether due process has been violated by the admission of identification testimony. `A defendant first must prove *Page 472 
that the identification procedure was unnecessarily and impermissibly suggestive, and courts then will consider the reliability of the identification by balancing the Biggers factors against the suggestiveness of the procedure.' Project: Thirteenth Annual Review of Criminal Procedure: United States Supreme Court And Courts of Appeal 1982-83, 72 Geo.L.J. 249, 334 (1983), citing United States v. Briggs, 700 F.2d 408, 412
(7th Cir.), cert. denied, 461 U.S. 947, 462 U.S. 1110 . . . (1983); Brayboy v. Scully, 695 F.2d 62, 65 (2d Cir. 1982), cert. denied, 460 U.S. 1055 . . . (1983) (`Since the identification procedure was not impermissibly suggestive, the issue of the reliability of Kolkmann's identification of Brayboy is not before us.'); United States v. Harper, 680 F.2d 731, 734 (11th Cir.), cert. denied, 459 U.S. 916 . . . (1982) (`First, as a threshold inquiry, the Court must decide whether the identification procedure was unnecessarily suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification.')."
500 So.2d at 1169.
Thus, whenever the in-court identification of the defendant is challenged, the first inquiry is whether the out-of-court identification procedure used was unnecessarily or impermissibly suggestive; if it was not, then the inquiry stops. Cochran. Only when the pretrial procedures used are unnecessarily or impermissibly suggestive must we analyze the totality of the circumstances under the factors set out in Neil v. Biggers,409 U.S. 188 (1972). Coleman v. State, 487 So.2d 1380 (Ala.Crim.App. 1986).
When an in-court identification is shown to have a basis independent of any pretrial identification or confrontation, it is properly admitted into evidence. Mullis v. State, 545 So.2d 205
(Ala.Crim.App. 1989); Coleman v. State; and Jackson v. State,414 So.2d 1014 (Ala.Crim.App. 1982).
After reviewing the record in this case pertaining to Humphries's out-of-court identification, we hold that the procedures used were not unnecessarily or impermissibly suggestive in that they did not create a substantial risk of misidentification and thus taint the in-court identification of the appellant by Humphries. Further, we find in the record an independent basis for the in-court identification. Humphries's in-court identification was clearly based on a source independent of the photographic lineups. Humphries had ample opportunity to observe the appellant, in daylight and at close range, shortly before the crimes were committed and again during the commission of the crimes; she obviously paid close attention to what was happening; her descriptions of the appellant and Coffman and their vehicle turned out to be quite accurate; she was positive and did not hesitate in identifying the appellant at trial; and the length of time between the commission of the crimes and her in-court identification, which was approximately two years, was not such as would likely dim her memory of what she had observed and endured. Moreover, when assessing reliability, courts may also consider the strength of other evidence against the defendant. United States v. Tisdale,817 F.2d 1552 (11th Cir.), cert. denied, 484 U.S. 868 (1987). In the present case, Humphries's testimony was strongly supported by the other evidence. Assuming arguendo that the pretrial identification procedures were impermissibly suggestive, and we do not concede that they were, the independent basis of Humphries's in-court identification was so strong and reliable that there was no substantial likelihood that the pretrial identification, even if *Page 473 
suggestive, would have led to an in-court misidentification. The appellant's contention that Humphries was under the influence of "painkillers" at the time she identified him in the photographic lineups to such as extent that her identification would be suspect is not supported by the record.
The trial court properly denied the appellant's motion to suppress Humphries's identification of the appellant. We find no merit in the appellant's contentions.
 III.
The appellant contends that the state failed to establish a proper chain of custody for the admission into evidence of three of the four spent shell casings found at the scene of the crime on August 16, and on August 18, 1994, and of the bullet recovered on August 16, 1994. He argues that the crime scene was not properly secured by the police so as to prevent tampering and alteration of the evidence. He contends that the admission of the shells and the photographs of them into evidence, without establishing a chain of custody to show that there was no reasonable probability that the shells had not been tampered with, altered, or substituted, constituted reversible error.
The purpose of establishing a chain of custody is to demonstrate with reasonable probability that the evidence has not been tampered with or altered. Graham v. State, 593 So.2d 162
(Ala.Crim.App. 1991); Bridges v. State, 516 So.2d 895
(Ala.Crim.App. 1987).
 ". . . We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain. McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App. 1988).'"
Ex parte Holton, 590 So.2d 918, 919-20 (Ala. 1991).
 "[I]t is not necessary to prove to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from the object at the commencement of the chain. Slaughter v. State, 411 So.2d 819
(Ala.Crim.App. 1981), cert. denied, 411 So.2d 819 (Ala. 1982). See also, Mauldin [v. State, 402 So.2d 1106 (Ala.Cr.App. 1981)]; Sexton v. State, 346 So.2d 1177 (Ala.Crim.App.), cert. denied, 346 So.2d 1180 (Ala. 1977). Moreover, where a weak link in the chain of custody is said to exist, it presents a question of the credit and weight to be afforded the evidence, rather than the admissibility of the item. Williams v. State, 375 So.2d 1257 (Ala.Crim.App.), cert. denied, 375 So.2d 1271
(Ala. 1979). Grice v. State, 481 So.2d 449, 451
(Ala.Crim.App. 1985)."
Bridges v. State, 516 So.2d at 903-04.
The totality of the circumstances test is applied to alleged deficiencies in a chain of custody. Graham v. State; Moorman v. State, 574 So.2d 953 (Ala.Crim.App. 1990).[4]
 "`The principles governing chain of custody challenges were outlined in *Page 474 
United States v. Lane, 591 F.2d 961 (D.C. Cir. 1979), as follows:
 "`"Tangible evidence of crime is admissible when shown to be `in substantially the same condition as when the crime was committed.' And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved `[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.' If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
 "`"The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change. `The possibility of misidentification and adulteration must be eliminated,' we have said, `not absolutely, but as a matter of reasonable probability.' So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances."'"
Moorman v. State, 574 So.2d at 956-57. See also Snowden v. State,574 So.2d 960 (Ala.Crim.App. 1990).
In the instant case, the officers arrived at the scene in the afternoon of August 15, 1994, shortly after the crimes had been committed. To secure the crime scene, they placed yellow police tape around the area and began a search of the area for evidence. On that day, they found two spent shell casings in the grass. The officers remained at the scene on that date until about 10:00 p.m. They left the crime scene unattended over the night and returned around noon on August 16 and continued their investigation and the search of the scene. They found two more spent shell casings and recovered a spent bullet from the door post of Humphries's automobile. The crime scene was left unattended at night and the officers returned each day until they had completed their investigation, which apparently took four days. On August 18, another spent shell casing was found. The shell casings found on August 15 and 16 were placed in the same envelope. One of these casings was the one identified as having been fired from the appellant's pistol. We cannot ascertain from the record whether it was found on August 15 or 16.
The appellant, in effect, argues that leaving the crime scene unattended at night amounted to a break in the chain of custody as to the shell casings and bullet and that the state failed to lay a sufficient predicate that there was a reasonable probability that the items found were original to the scene or had been there since the crimes were committed or were in the same condition as they were at the commencement of the chain. The crime scene was in an isolated and unlighted rural area, well off the highway, and behind a church. The officers were apparently satisfied that the posting of the area with yellow police tape was sufficient to secure the crime scene in that particular location. There was no indication that the crime scene had been tampered with in any manner. The appellant did not allege or make any showing of ill will, bad faith, evil motive, or evidence of tampering by the investigators or anyone else. Without some showing in this regard, it is reasonable to assume that the items referred to above that were found at the scene were in substantially the same condition as when the crimes were committed and were evidence of the crimes themselves. We do not find a break in the chain of custody. The state established a chain of custody sufficient to authenticate the items and allow their admission into evidence. Applying the totality of the circumstances test, we conclude that there is a reasonable probability that the evidence was intact, and we find that the trial court committed no error in *Page 475 
allowing the shell casings and bullet into evidence.
 IV.
The appellant contends that the trial court committed reversible error by denying his motion to absent himself from a pretrial suppression hearing on the state's evidence relating to or stemming from pretrial photographic lineups involving him. The trial court denied his motion and required his presence at the suppression hearing. We find no merit in this contention. His reliance on Ala.R.Crim.P. 9.1 and Ex parte DeBruce, 651 So.2d 624
(Ala. 1994), is misplaced. While a defendant in a capital case may waive his appearance at some pretrial proceedings under some circumstances, Ex parte DeBruce, neither Ex parte DeBruce nor Rule 9.1 gave him the right to be absent.[5]
 "`Although it has sometimes been argued that a defendant should have a right to be absent from his trial if he so chooses, the law generally is to the contrary. "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right," [Singer v. United States, 380 U.S. 24, 34-35, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965)] and thus it does not follow from the fact that the right of presence can be waived or forfeited that a defendant can insist upon a right not to attend his trial.'"
Cox v. State, 585 So.2d 182, 197 (Ala.Crim.App. 1991), cert. denied, 503 U.S. 987 (1992) (quoting with approval 3 W. LaFave and J. Israel, Criminal Procedure § 23.2(c) at 9 (1984)).
We hold that the appellant had no right to be absent from the suppression hearing, and the trial court's denial of his motion was proper.
 V.
The appellant contends that the trial court committed reversible error in denying his motion in limine seeking to have the two prosecuting attorneys removed from the prosecution of his case and new prosecutors substituted on the grounds that the prosecutors were present when the appellant gave incriminating statements to the police and that they testified at the hearing on the appellant's motion to suppress his statements. The record shows that the two prosecutors in question were present when some of the appellant's statements were given; however, they testified at the hearing on the motion in limine that they did not participate in the interrogation, but that they were merely observers. They were not called as witnesses during the trial and did not testify before the jury. The rule against prosecutors testifying as witnesses in jury trials in criminal cases is premised upon the concern that the jury might be improperly influenced because of the prestige and authority of the office of the prosecutor. Tarver v. State, 492 So.2d 328, 329-30
(Ala.Crim.App. 1986), aff'd, 553 So.2d 633 (Ala. 1989), cert. denied, 494 U.S. 1090 (1990), and cases cited therein. However, because neither prosecutor was called as a witness or testified before the jury, there was no possibility of the jury's being improperly influenced in this case. The trial court properly denied the motion in limine seeking removal of the prosecutors.
 VI.
The appellant contends that the trial court erred in denying his motion to suppress his inculpatory statements on the grounds that they were obtained in violation of his Fifth and Sixth Amendment rights under the Constitution of the United States; more specifically he argues that he did not knowingly, intelligently, and *Page 476 
voluntarily waive his right to counsel, and that his statements were illegally obtained from him by interrogation after he had invoked his right to counsel.
The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." The United States Supreme Court in Miranda v. Arizona established procedures to safeguard a defendant's Fifth Amendment privilege against the inherently coercive effects of custodial interrogation. Miranda requires that before questioning a suspect in custody, law enforcement officials must inform the suspect of certain rights, including the right to have an attorney present during questioning, and that if the suspect cannot afford an attorney, one will be appointed for him. Id. at 444. Failure to inform a suspect of his Fifth Amendment rights before questioning renders any pretrial statements elicited from the suspect during custodial interrogation inadmissible at trial. Id. at 492. In Miranda, the Supreme Court held that when the person being questioned invokes his right to counsel, the interrogation must cease until an attorney has been made available. Id. at 473-74. The Supreme Court held in Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), that "unless the accused himself initiates further communication, exchanges, or conversations with the police," invocation of the right to counsel bars further interrogation without counsel. In Oregon v. Bradshaw,462 U.S. 1039, 1045-46 (1983) (plurality opinion), the Supreme Court held that a defendant who "evinced a willingness and a desire for a generalized discussion about the investigation," had effectively initiated conversation under Edwards v. Arizona, despite having earlier asserted his right to counsel. See also Henderson v. Dugger, 925 F.2d 1309, 1212-13 (11th Cir. 1991).
"Inculpatory admissions in the nature of a confession — that is, directly relating to the facts or circumstances of the crime, and connecting the defendant therewith — are subjected to the same rules of admissibility, as direct confessions, and are therefore prima facie involuntary and inadmissible." McGehee v. State,171 Ala. 19, 22, 55 So. 159, 160 (1911) (citations omitted). Morevoer, no distinction is made between inculpatory and exculpatory statements. Miranda, 384 U.S. at 477. Inculpatory statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver as any other statement. Id. See also Coral v. State, 628 So.2d 954
(Ala.Crim.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012 (1994); Arthur v. State, 575 So.2d 1165
(Ala.Crim.App. 1990), cert. denied, 575 So.2d 1191 (Ala. 1991). However, volunteered statements of any kind are not barred by the Fifth Amendment, and their admissibility is not affected by the holding in Miranda. Miranda, 384 U.S. at 478; Williams v. State,601 So.2d 1062 (Ala.Crim.App. 1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957 (1992). A spontaneous statement, volunteered by an accused and volunteered to a police officer prior to any questioning, is admissible against the accused even though he was not given Miranda warnings. Magwood v. State, 494 So.2d 124
(Ala.Crim.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995 (1986).
The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." The rights of the accused under the Sixth Amendment have been held to attach "at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." United States v. Gouveia, 467 U.S. 180, 187-88
(1984). We *Page 477 
have previously held that where the interrogating officer knows that the accused is represented by counsel but nevertheless interviews the accused at a time when counsel is not present, willingly and by subterfuge bypassing the presence of defendant's counsel, the accused is denied his constitutional right of counsel, and such denial is not cured by a contention that the inculpatory statement secured at the time was voluntary. Thompson v. State, 347 So.2d 1371 (Ala.Crim.App.), cert. denied,347 So.2d 1377 (Ala. 1977), cert. denied, 434 U.S. 1018 (1978); Freeman v. State, 342 So.2d 435 (Ala.Crim.App. 1977).
The oft-stated rule is that a confession is prima facie involuntary and inadmissible, and the state must show voluntariness and lay a Miranda predicate in order for the confession to be admitted. Thomas v. State, 373 So.2d 1167 (Ala. 1979), vacated on other grounds, 448 U.S. 903 (1980); Coral v. State; Lewis v. State,575 So.2d 228 (Ala.Crim.App.), cert. denied, 575 So.2d 228 (Ala. 1988). (Of course, as we have previously noted, this principle does not apply to volunteered statements.) Clearly, a constitutional right, such as the right to counsel, may be waived, even at critical stages of the proceedings. Escobeda v. Illinois,378 U.S. 478 (1964); Johnson v. Zerbst, 304 U.S. 458 (1938); United States v. Wade, 388 U.S. 218, 237 (1967). Whether a waiver of the right to remain silent and the right to counsel is voluntarily, knowingly, and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accused — i.e., the totality of the circumstances. Lewis v. State; Chandler v. State,426 So.2d 477, 478 (Ala.Crim.App. 1982) (citing Edwards v. Arizona; Myers v. State, 401 So.2d 288 (Ala.Crim.App. 1981), and cases cited therein. An accused may waive the right to have counsel present at an interrogation at a critical stage after counsel has been retained or appointed, the burden being on the prosecution to show that the waiver of counsel's presence was voluntarily, knowingly, and intelligently made. Brewer v. Williams, 430 U.S. 387 (1977); Miranda v. Arizona; Nelson v. State, 398 So.2d 421 (Ala.Crim.App. 1981). Thus, the fact that a defendant was represented by counsel does not mean, per se, that law enforcement officials cannot procure a statement of any kind from the accused without prior notice to, and the consent of, his counsel. Brewer v. Williams; Miranda v. Arizona; Nelson v. State. In Moran v. Burbine,475 U.S. 412 (1986), the defendant challenged the validity of his otherwise voluntary and intelligent waiver of his Miranda rights on the ground that the police failed to inform him of the efforts of a public defender to contact him. The Court held that such police conduct, if entirely unknown to the defendant, had no bearing on his ability to comprehend and knowingly relinquish a constitutional right. The Court held, "[W]e are not prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him." Id. at 425. The Court's decision focused on the voluntariness of the suspect's waiver as well as the state court's finding that there was no conspiracy or collusion on the part of the police. In Ex parte Neelley, 494 So.2d 697, 699 (Ala. 1986), cert. denied, 480 U.S. 926 (1987), the Alabama Supreme Court, applying the holding in Moran v. Burbine, held that "neither petitioner's Fifth nor Sixth Amendment rights were violated by the failure of the interrogating authorities (who had given petitioner the Miranda warnings) to inform her of the presence of an attorney who had been sent at the request of a third party." Cf. Smith v. State, 588 So.2d 561, 575-77 (Ala.Crim.App. 1991). *Page 478 
In the instant case, the record shows that the crimes were committed shortly after 1:00 p.m. on August 15, 1994; that, around 7:00 p.m. the same day, the appellant was arrested for committing the crimes; that he was advised of his Miranda rights by an officer shortly after his arrest; that he refused to sign an acknowledgement that he had been advised of his Miranda rights or that he had waived of those rights; and that, when he was advised of his rights, he "started cussing everybody out" and volunteered that he had not killed anybody and was not involved in the crimes. No interrogation occurred on this occasion. On August 18, 1994, he was interviewed by an officer about an unrelated arson case, and during this interview he stated that he wanted an attorney before he talked to anyone about the crimes at issue here. He was not interrogated on this occasion about these crimes. On August 20, 1994, Officer Dannie Certain of the Madison County Sheriff's Department, the chief investigator of the crimes involved in this case, was contacted by the appellant's father, who told him that the appellant wanted to talk with him at the jail. Upon arriving at the jail, Certain advised the appellant of his Miranda rights, and the appellant executed an acknowledgement and waiver of those rights. Certain asked the appellant if he had telephoned his father and had had his father contact Certain and request that Certain come to the jail, and the appellant responded that he had. After the appellant signed the waiver of rights form, Certain asked him "what he had to tell us," and the appellant related in his own words his version of the crimes and his involvement or lack of involvement in them. After he had finished his statement, which was not recorded, Certain asked him if he would repeat it so that he could record it. The appellant repeated the statement; however, the recording device failed to work properly and only a small portion of the statement was recorded. Certain then asked the appellant if he would write out his statement in his own handwriting, which he did. After a discussion with Certain, the appellant volunteered to take a polygraph examination if one could be arranged. On August 24, 1996, the appellant completed a questionnaire in preparation for taking the polygraph examination; however, the polygraph examination was cancelled because of time constraints, and it was never rescheduled. Before completing the questionnaire, the appellant was again advised of his Miranda rights and he again waived them, signing an acknowledgment and waiver. The questionnaire was, in essence, another statement almost identical to the appellant's previous written statement. The first oral statement, the second oral statement (which was partially recorded), the statement written in the appellant's own handwriting, and the completed questionnaire were all practically identical. In all of his statements, except the first volunteered statement in which he denied involvement in the crimes, while admitting that he was present at the scene when the crimes were committed, he denied knowledge that any crime was going to be committed, denied any involvement in the crimes, and placed the entire blame upon Coffman. The appellant's written statement, the portion of the oral statement that was tape-recorded, and the questionnaire were admitted into evidence and are a part of the record.
The appellant's first statement, which he made shortly after he was arrested, where he denied involvement in the crimes, was volunteered, was not subject to Miranda warnings, and was properly admitted. Miranda; Williams v. State; Magwood v. State. The appellant's statements are not direct confessions, but are admissions. His first statement, which was volunteered, was exculpatory, and the remaining statements were inculpatory, even though he denied involvement in the crimes, because they connected him in some respects with the criminal activity and placed him at the scene of the crimes when they were committed. As we have previously stated, the same rules of admissibility apply to *Page 479 
admissions, both inculpatory and exculpatory, as apply to confessions. Miranda; McGehee v. State; Coral v. State.
The record in this case supports the conclusions that full Miranda warnings were given the appellant; that there was no improper influence, threats, intimidation, coercive factors, or other inducement to obtain the appellant's statements; and that he initiated the conversations with Investigator Certain after he had initially invoked his right to counsel. He was informed of his right to counsel before making his inculpatory statements or admissions, and he clearly voluntarily, knowingly, and intelligently waived that right and chose to talk with the investigator. The facts do not support the appellant's contention that his statements were illegally obtained. The appellant, who was 31 years of age, knew what he was doing. In fact, the appellant was obviously eager to discuss the case with the investigators, and willingly repeated his story in his own words four times. He seems to have done all the talking, and there was little or no interrogation. He "evinced a willingness and a desire for a generalized discussion about the investigation," without counsel, even though he had earlier asserted his right to counsel. Clearly, he initiated the conversations with the investigators. Oregon v. Bradshaw. Although the record shows that the appellant filed a written request for appointment of counsel with the trial court on August 17, 1994, and that counsel was appointed that day and further shows that on August 18, 1994, when he was questioned about an unrelated crime, he stated that he did not wish to talk about these crimes until he had an attorney, neither the appellant nor Certain knew of the appointment of counsel when the statements were made and the questionnaire was completed. On August 20, 1994, Certain asked the appellant before receiving his statement if he had an attorney, and he responded that he did not have one at that time. Certain did not learn that counsel had been appointed until the preliminary hearing on September 21, 1994. There is nothing in the record to suggest the investigator or anyone else willingly or by subterfuge bypassed the presence of the appellant's counsel. The rulings in Moran v. Burbine, Thompson v. State, Freeman v. State, and Ex parte Neelley, are not applicable in this case.
Our review and assessment of the totality of the circumstances surrounding the appellant's inculpatory statements convinces us that the statements were voluntarily given after a knowing and intelligent waiver of the appellant's Fifth Amendment rights. Such a review also convinces us that the appellant made voluntarily and intentionally relinquished his known right to have counsel present before talking with Certain. We hold that the prosecution met the standard required to show a waiver of the appellant's Fifth and Sixth Amendment rights. Accordingly, we further hold that the trial court's denial of the appellant's motion to suppress the statements was proper, and the statements were properly admitted into evidence.
 VII.
The appellant contends that any statements and all evidence arising from his warrantless arrest should have been suppressed because, he argues, Deputy Sheriff Pete Hose did not have the required legal authority to search the mobile home he was in when he was arrested and that Hose had no probable cause to arrest him. We find no merit to this contention.
The record shows that Hose was on routine patrol when he received a radio dispatch that shots were being fired in or near a mobile home park. Upon arriving, a child informed Hose that the shots came from the far east corner of the park, and directed him toward a particular mobile home. A woman,[6] who was at the *Page 480 
front door of the mobile home, beckoned Hose and said, "He's in here. He's back there, and he's got a gun. Be careful." The record also shows that Wanda Oliver, the appellant's aunt and the owner of the mobile home gave her consent to Hose, along with a city police officer, to enter her home. Hose went down the hallway to a bedroom where he found the appellant lying on a bed. He advised the appellant to stand up and to keep his hands above his head. He conducted a patdown search of the appellant for safety purposes, and in doing so, discovered a clip to a small caliber semiautomatic pistol, a knife, and some identification cards that were obviously not his. Although the record is not clear, apparently at some point during this time, Hose was notified by radio that the appellant was wanted as a suspect in a murder that had occurred earlier that day. Hose handcuffed the appellant "for safekeeping," escorted him out of the mobile home, and placed him in the patrol car. We also note that it does not appear from the record that Hose searched any portion of the mobile home, but rather that he was directed by Oliver to the location of the loaded pistol, which was lying on the top of a box of clothes.
 "`One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving the consent was given freely and voluntarily. State v. Ossey, 446 So.2d 280 (La. 1984); State v. Wolfe, 398 So.2d 1117 (La. 1981).'"
Brannon v. State, 521 So.2d 1356, 1359 (Ala.Crim.App. 1987) (quoting State v. Owen, 453 So.2d 1202, 1206 (La. 1984)).
It is apparent that Hose did not go to Oliver's home to arrest the appellant for a felony, but rather went there to investigate the "shots-being-fired" call. Under the circumstances present upon his arrival, Hose had every reason to believe that a dangerous person was in Oliver's home. Further, the evidence is undisputed that Oliver voluntarily gave her consent for the officers to enter. Therefore, we hold that there was a valid consenual search and that it was proper for Hose to search the appellant before his arrest.
 "In the absence of probable cause for arrest, officers have a right under appropriate circumstances to stop and interview a person for purposes of investigation. In such a situation, a limited exception to the search warrant requirement exists allowing officers to search the person and immediate vicinity for weapons where the officers have reason to believe their safety is endangered. Terry v. Ohio, 392 U.S. 1 . . . [1968]; Sibron v. New York, 392 U.S. 40 . . . [1969]."
United States v. Bonds, 422 F.2d 660, 665 (1970). Given the facts available to Hose at the time, he would have been derelict in his duty as a law officer if he had not ensured his safety and the safety of others.
Finally, the appellant argues that Hose did not have probable cause to arrest him and, in particular, he notes that Hose testified that he did not have probable cause to arrest the appellant. "[B]ecause the test for determining probable cause is an objective and not a subjective test, this court may "`find probable cause in spite of an officer's judgment that none exists. "`" Hopkins v. State, 661 So.2d 774, 779 (Ala.Crim.App. 1994) (quoting 1 LaFave § 3.2(b), in turn is quoting United States ex rel. Senk v. Brierly, 381 F. Supp. 447 (M.D.Pa. 1974), aff'd, 511 F.2d 1396 (3rd Cir.), cert. denied, 423 U.S. 843 (1975)). "[W]hen considering whether an arrest is valid, a police officer's subjective intent is immaterial; the only requisite is that at the time the arrest is made, the police have probable cause." Carruth v. Barker, 454 So.2d 539, 540 (Ala. 1984). Clearly, when Hose was notified that the appellant was wanted in a murder that had occurred that day, particularly in view of the fact that Hose had *Page 481 
discovered during his safety patdown of the appellant a semi-automatic pistol clip, a knife, and identification cards belonging to someone else (which turned out to belong to the victim, Humphries), Hose had probable cause to arrest the appellant.
For these reasons, the trial court's denial of his motion to suppress on the grounds asserted here was proper.
 VIII.
The appellant contends that after opening statements but before the testimony of the first witness, "several matters were discussed at the bench outside of the Defendant's presence during a recess." He specifically argues that a juror made a belated response to voir dire questions when he was not present. However, we cannot recognize factual assertions made in brief that are not disclosed or supported by the record; this court is bound by the record. Moore v. State, 457 So.2d 981 (Ala.Crim.App. 1984), cert. denied, 470 U.S. 1053 (1985). Although the record shows that during the hearing on the motion for new trial there was some discussion regarding a time during a recess when the appellant was not sitting at the defense table, the record falls short of showing that the appellant was absent from the courtroom. In fact, the record does not show that the appellant was absent during any of the trial proceedings; thus, in the absence of evidence to the contrary, we must presume that he was present at all times. Pike v. State, 47 Ala. App. 161, 251 So.2d 779 (1971).
 IX.
The appellant contends that, during closing argument, reversible error occurred when the prosecutor, on two occasions, allegedly commented on the appellant's failure to testify and also when the prosecutor commented on codefendant Coffman's conviction for the same crimes. In each instance the appellant objected to the comments and/or moved for a mistrial. The trial court overruled the objections and denied the motions for a mistrial.
First, we note,
 "A mistrial should be granted only when manifest necessity is demonstrated. Wadsworth v. State, 439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied, 466 U.S. 930 . . . (1984). It is clear that "`[a] motion for mistrial should not be granted where the prejudicial qualities of the comment can be eradicated by action of the trial court.'" Register v. State, 640 So.2d 3, 10 (Ala.Cr.App. 1993), aff'd, 680 So.2d 225 (Ala. 1994), quoting Henry v. State, 468 So.2d 896, 901 (Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985). See Stanton v. State, 648 So.2d 638, 643 (Ala.Cr.App. 1994). `The grant or denial of a mistrial is a matter within the sound discretion of the trial court and will only be disturbed upon a showing of manifest abuse.' Roundtree v. State, 461 So.2d 31, 33
(Ala.Cr.App. 1984). Furthermore, when the `trial court promptly charges the jury to disregard improper remarks, there is a presumption against error and the prejudicial effects thereof are removed.' Parker v. State, 549 So.2d 989, 992
(Ala.Cr.App. 1989), quoting Haywood v. State, 501 So.2d 515, 519 (Ala.Cr.App. 1986)."
Huffman v. State, [Ms. CR-95-1916, April 18, 1997] 706 So.2d 808, (Ala.Crim.App. 1997).
 A.
The first comment complained of is as follows:
 "No, we heard testimony about — I am not talking about in the statement, but other testimony about business to take care of, we have got to go. All of a sudden there is a rush for time. In that rush for time they go from a trailer there in New Market down near Gurley, the Flint River, and nowhere in either written statement is it ever mentioned why they were going anywhere. It was never mentioned. It was never *Page 482 
mentioned why they went to that particular place.
 "Also, when they get there, in the statement — the defendant admits in that statement he asked for the fellow in the Cadillac. It was never mentioned why. Why was he asking for the fellow in the Cadillac?"
Defense counsel objected to the comment, stating:
 "We object to the last statement of counsel saying that there was no explanation of why they were out there. That's a direct comment on the defendant's failure to testify. We object and move for a mistrial."
Following its denial of the motion for a mistrial, the trial court instructed the jury to "disregard the last statement of the prosecutor. Disregard the statement regarding the man in the car. Don't consider that in your deliberations."
The appellant argues that the trial court's instructions in this instance compounded and magnified what, he says, was an improper comment upon his failure to testify. We need not reach the question whether the court's instructions were curative because we hold that the comment was not a comment upon the appellant's failure to testify.
 "`Alabama law clearly holds that "[w]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Ala. of 1901] is violated.'" Ex parte Wilson, 571 So.2d 1251, 1262 (Ala. 1990). However, `a prosecutor may legitimately base his argument on the evidence of the appellant's statement' to the police. Hereford v. State, 608 So.2d 439, 442 (Ala.Cr.App. 1992). See also Henderson v. State, 584 So.2d 841, 855 (Ala.Cr.App. 1988); Smith v. State, 588 So.2d 561, 570 (Ala.Cr.App. 1991); Kimble v. State, 545 So.2d 228, 230 (Ala.Cr.App. 1989); Brinks v. State, 500 So.2d 1311, 1314-15 (Ala.Cr.App. 1986). `Argument by the prosecution concerning omissions and inconsistencies in the defendant's version of the case is not improper.' Salter v. State, 578 So.2d 1092, 1096 (Ala.Cr.App. 1990), cert. denied, 578 So.2d 1097 (Ala. 1991)."
Mosely v. State, 628 So.2d 1041, 1042 (Ala.Crim.App. 1993). Unquestionably, the above comments by the prosecutor were directed toward the written statement and the questionnaire the appellant gave to the authorities; he was pointing out the omissions in those statements. Thus, the trial court properly denied the motion for a mistrial.
The record regarding the second comment complained of shows the following:
 "The theory. We have heard some talk from the defense that there was some talk that David Coffman is a hit man. David Coffman is a hit man. In fact, they asked Dannie Certain about that. Have you ever known David Coffman to be connected with any other killings? Certain answered, `Yes.' And there was something about a contract. But, other than that statement by Dannie Certain, there is no proof of any kind of a contract killing or hit. It's just talk in opening statement. That's all we have heard. Even in that regard, if they want you to believe this was a contract hit, the defendant was with him."
"[DEFENSE COUNSEL]: Your Honor, same objection; same motion.
"THE COURT: Overruled."
We question whether the trial court was sufficiently put on notice of the specific comment defense counsel was objecting to. See Kimble v. State, 545 So.2d 228 (Ala.Crim.App. 1989) (it is the duty of opposing counsel to object specifically and to point out substantially the language deemed objectionable).
Assuming, arguendo, that this complaint is preserved, clearly this comment by the prosecutor was a reference to the defense's theory that Coffman was a hired *Page 483 
hit man, that robbery was not the motive, and that, although the appellant was with Coffman when the crimes occurred, he did not do the shooting and was not involved. The prosecutor's argument regarding the defense's theory was a fair and legitimate comment on the evidence and a fair response to the argument of the defense. It was not a comment on the appellant's failure to testify. See Brinks v. State, 500 So.2d 1311 (Ala.Crim.App. 1996). The trial court properly overruled the appellant's objection.
 B.
The appellant contends that the following comment was improper because, he says, it was irrelevant and highly prejudicial:
 "The last point made by the defense is that Coffman, the co-defendant in this case, was convicted earlier, a few months ago, on the very same charge as this defendant sits before you today charged with. He was not convicted of being a hit man, but this exact same thing we are here on today."
The trial court did not specifically rule on the appellant's objection to this comment; however, it did instruct the jury that the prosecutor's remarks were not evidence and that the jury should not consider the comment in its deliberations.
In Stokes v. State, 462 So.2d 964, 966-67 (Ala.Crim.App. 1984), we addressed an almost identical comment and discussed the general rule of inadmissibility of a codefendant's conviction, as follows:
 "A survey of the Alabama cases on this point reveals that disclosure of the outcome of a co-defendant's case has been denounced whether it occurred in argument, see Knowles v. State, 44 Ala. App. 163, 204 So.2d 506 (1967) (Prosecutor's statement that other defendants had already pled guilty); Bell v. State, 41 Ala. App. 561, 140 So.2d 295 (1962) (Prosecutor's statement that co-defendant had confessed); Lowery v. State, 21 Ala. App. 352, 108 So. 351 (1926) (District attorney's comment that one person had already been convicted); Felder v. State, 20 Ala. App. 603, 104 So. 444 (1925) (Prosecutor's comment that, `The other man had pleaded guilty'), in the State's case-in-chief, see Williams v. State, 369 So.2d 910
(Ala.Crim.App. 1979) (State's witness asked whether he testified in case when co-defendant was convicted); Lane v. State, 40 Ala. App. 174, 109 So.2d 758 (1959) (State asked co-indictee the outcome of his prosecution); Evans v. State, 39 Ala. App. 498, 105 So.2d 831 (1958) (District attorney asked accomplice whether he was guilty of same offense with which defendant was charged), or during the presentation of the defense, see Dickens v. State, 49 Ala. App. 480, 273 So.2d 240
(1973) (Defendant questioned, on cross-examination, about co-defendant's guilty plea); McGhee v. State, 41 Ala. App. 669, 149 So.2d 1 (1962) (Defendant sought to present evidence of co-defendant's acquittal); Hill v. State, 210 Ala. 221, 97 So. 639 (1923) (Defendant claimed his own prosecution should be barred by accomplice's acquittal).
 "In all of the Alabama cases cited above, the reviewing courts have disapproved of reference to the disposition of a co-defendant's case on the theory that the outcome of another's prosecution is simply irrelevant to the guilt or innocence of the defendant and may not be received as substantive evidence at defendant's trial. See, e.g., Hill v. State, 210 Ala. 221, 97 So. 639 (1923). This is not to say, of course, that for impeachment purposes, a co-defendant may not be questioned regarding his conviction for the same offense. See generally C. Gamble, McElroy's Alabama Evidence § 149.01(8) (3d ed. 1977). The trial court should receive the latter kind of evidence, however, only as it bears on the testifying co-defendant's credibility and should, on request, instruct the jury regarding its limited purpose. See *Page 484 
generally 1 Wigmore, Evidence § 13 (Fillers rev. 1983)."
Therefore, we hold that the above comment by the prosecutor in this case was improper. However, we also held in Stokes that reversal is not required when the error is cured by the trial court's prompt instruction to the jury to disregard the prosecutor's remark. Here, the trial court instructed the jury, "Ladies and gentlemen, that evidence is not before you. Don't consider any of that in your deliberations." Under the circumstances of this case, we hold that any error was cured by these instructions. See Stokes v. State; Williams v. State,369 So.2d 910 (Ala.Crim.App. 1979); Bell v. State, 41 Ala. App. 561,140 So.2d 295 (1962).
 X.
The appellant contends that the trial court's jury instructions were inadequate because, he says, the instructions failed to properly address the issue relating to specific intent to kill. This issue is not preserved for review. Defense counsel did not timely object to the instructions.
 "`[O]bjections to portions of the court's oral charge cannot be raised for the first time on motion for new trial.' Harris v. State, 412 So.2d 1278, 1282 (Ala.Cr.App. 1982). See also Duncan v. State, 436 So.2d 883, 906 (Ala.Cr.App. 1983) (`even if the manner in which the trial court delivered its oral charge and the subsequent requested charge was error, which we do not hold that it was, appellant's objections[, which were raised in his motion for a new trial,] came too late') (emphasis omitted), cert. denied, 464 U.S. 1047, 79 L.Ed.2d 182, 104 S.Ct. 720 (1984), overruled on other grounds, Jackson v. State, 516 So.2d 726 (Ala.Cr.App. 1985). `Proper objections to the trial judge's failure or refusal to give the defendant's requested written instructions may not be raised for the first time on the motion for new trial. See Gurley v. State, 216 Ala. 342, 113 So. 391 (1927); Hewitt v. State, 389 So.2d 157 (Ala.Cr.App. 1980).' Coleman v. State, 420 So.2d 833, 834 (Ala.Cr.App. 1982)."
Hunter v. State, 645 So.2d 370, 371 (Ala.Crim.App. 1994). The trial court did not err in denying the motion for a new trial on this ground.
For the above reasons, the trial court's judgment in this case is due to be, and it is hereby, affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
ALL JUDGES CONCUR.
[1] David Anthony Coffman was indicted for the same offenses as the appellant in this case. He was tried before a jury and convicted on both counts of the indictment, i.e., murder committed during a robbery and attempted murder, and was sentenced to life imprisonment without the possibility of parole on the murder-robbery conviction and life imprisonment on the attempted murder conviction. The Alabama Court of Criminal Appeals affirmed his convictions by an unpublished memorandum. Coffman v. State, [Ms. CR-95-0874, June 20, 1997] 717 So.2d 893 (Ala.Cr.App. 1997) (table). The Alabama Supreme Court denied Coffman's petition for certiorari review on November 21, 1997, and the Court of Criminal Appeals issued its certificate of judgment on the same date.
[2] Miranda v. Arizona, 384 U.S. 436 (1966).
[3] Cochran v. State, 400 So.2d 435 (Ala.Cr.App. 1981), writ denied, 400 So.2d 435 (Ala. 1981), app. after remand, 500 So.2d 1161
(Ala.Cr.App. 1984), aff'd in part, rev'd in part, 500 So.2d 1179
(1985), on remand, 500 So.2d 1188 (Ala.Cr.App. 1986), aff'd,500 So.2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033 (1987), grant of habeas corpus aff'd, 61 F.3d 20 (11th Cir. Ala. 1995), cert. denied, 116 S.Ct. 776, 133 U.S. 728 (1996).
[4] Section 12-21-13, provides as follows:
 "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
[5] Rule 9.1, Ala.R.Crim.P. was amended effective December 1, 1997, to permit a capital defendant to waive his right to be present at all stages of the proceedings, except sentencing.
[6] The record does not clearly indicate whether this woman was Wanda Oliver, the owner of the mobile home, or Carol Henderson, a neighbor.